# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## NOTICE OF ENTRY OF
## JUDGMENT ACCOMPANIED BY OPINION

### OPINION FILED AND JUDGMENT ENTERED: 05/09/2017

The attached opinion announcing the judgment of the court in your case was filed and judgment was entered on the date indicated above. The mandate will be issued in due course.

Information is also provided about petitions for rehearing and suggestions for rehearing en banc. The questions and answers are those frequently asked and answered by the Clerk's Office.

Costs are taxed against the appellant in favor of the appellee under Rule 39. The party entitled to costs is provided a bill of costs form and an instruction sheet with this notice.

The parties are encouraged to stipulate to the costs. A bill of costs will be presumed correct in the absence of a timely filed objection.

Costs are payable to the party awarded costs. If costs are awarded to the government, they should be paid to the Treasurer of the United States. Where costs are awarded against the government, payment should be made to the person(s) designated under the governing statutes, the court's orders, and the parties' written settlement agreements. In cases between private parties, payment should be made to counsel for the party awarded costs or, if the party is not represented by counsel, to the party pro se. Payment of costs should not be sent to the court. Costs should be paid promptly.

If the court also imposed monetary sanctions, they are payable to the opposing party unless the court's opinion provides otherwise. Sanctions should be paid in the same way as costs.

Regarding exhibits and visual aids: Your attention is directed Fed. R. App. P. 34(g) which states that the clerk may destroy or dispose of the exhibits if counsel does not reclaim them within a reasonable time after the clerk gives notice to remove them. (The clerk deems a reasonable time to be 15 days from the date the final mandate is issued.)

FOR THE COURT

/s/ Peter R. Marksteiner

Peter R. Marksteiner
Clerk of Court

15-5103, 15-5133 - Starr International Company v. US
United States Court of Federal Claims, Case No. 1:11-cv-00779-TCW

# United States Court of Appeals for the Federal Circuit

————————————

**STARR INTERNATIONAL COMPANY, INC., IN ITS OWN RIGHT AND ON BEHALF OF TWO CLASSES OF OTHERS SIMILARLY SITUATED,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Cross-Appellant*

**AMERICAN INTERNATIONAL GROUP, INC.,**
*Defendant*

————————————

2015-5103, 2015-5133

————————————

Appeals from the United States Court of Federal Claims in No. 1:11-cv-00779-TCW, Judge Thomas C. Wheeler.

————————————

Decided: May 9, 2017

————————————

DAVID BOIES, Boies, Schiller & Flexner, LLP, Armonk, NY, argued for plaintiff-appellant. Also represented by ANTHONY T. KRONMAN; ROBERT J. DWYER, ALANNA C. RUTHERFORD, New York, NY; AMY J. MAUSER, Washington, DC; GREGORY S. BAILEY, RYAN STOLL, Skadden, Arps, Slate, Meagher & Flom LLP, Chicago, IL; JOHN

GARDINER, New York, NY; CHARLES FRIED, Cambridge, MA.

MARK B. STERN, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-cross-appellant. Also represented by JEFFREY ERIC SANDBERG, KAREN SCHOEN, BENJAMIN C. MIZER.

JOHN S. KIERNAN, Debevoise & Plimpton LLP, New York, NY, for amicus curiae Federal Reserve Bank of New York. Also represented by LINDSAY C. CORNACCHIA, NICHOLAS C. TOMPKINS; SHARI D. LEVENTHAL, MEGHAN MCCURDY, Federal Reserve Bank of New York, New York, NY.

DENNIS M. KELLEHER, Better Markets, Inc., Washington, DC, for amicus curiae Better Markets, Inc.

————————————

Before PROST, *Chief Judge*, REYNA and WALLACH, *Circuit Judges*.

Opinion for the court filed by *Chief Judge* PROST.

Opinion concurring-in-part and concurring-in-the-result filed by *Circuit Judge* WALLACH.

PROST, *Chief Judge*.

Around September 2008, in the midst of one of the worst financial crises of the last century, American International Group, Inc. ("AIG") was on the brink of bankruptcy and sought emergency financing. The Federal Reserve Bank of New York ("FRBNY") granted AIG an $85 billion loan, the largest such loan to date. Central to this case, the United States ("Government") received a majority stake in AIG's equity under the loan, which the Government eventually converted into common stock and sold.

One of AIG's largest shareholders, Starr International Co., Inc. ("Starr"), filed this suit alleging that the Government's acquisition of AIG equity and subsequent actions relating to a reverse stock split were unlawful. The U.S. Court of Federal Claims ("Claims Court") held a trial on Starr's direct claims, for which Starr sought over $20 billion in relief on behalf of itself and other shareholders. The Claims Court ultimately held that the Government's acquisition of AIG equity constituted an illegal exaction in violation of § 13(3) of the Federal Reserve Act, 12 U.S.C. § 343, but declined to grant relief for either that adjudged illegal exaction or for Starr's reverse-stock-split claims. Starr appeals the denial of direct relief for its claims. The Government cross-appeals, arguing that Starr lacks standing to pursue its equity-acquisition claims directly or, alternatively, that the Government's acquisition of equity did not constitute an illegal exaction.

We conclude that Starr and the shareholders represented by Starr lack standing to pursue the equity-acquisition claims directly, as those claims belong exclusively to AIG. Because this determination disposes of the equity-acquisition claims, the other issues regarding the merits of those claims are rendered moot. We also conclude that the Claims Court did not err in denying relief for Starr's reverse-stock-split claims.

We therefore vacate the Claims Court's judgment that the Government committed an illegal exaction and remand with instructions to dismiss the equity-acquisition claims that seek direct relief. We affirm the judgment as to the denial of direct relief for the reverse-stock-split claims.

## I. BACKGROUND[1]

The 2008 financial crisis exposed many of the major financial institutions in the United States to substantial liquidity risks.  AIG was no exception.

This case relates to injuries that the Government allegedly inflicted on AIG and its shareholders, including Starr, in the process of saving AIG from bankruptcy.

### A

AIG is a publicly traded corporation with various insurance and financial services businesses.  Around 2007, it experienced a deteriorating financial condition due in part to a collapse of the housing market.  Leading up to the 2008 financial crisis, AIG had become a major participant in various derivatives markets, including by guaranteeing a portfolio of credit-default-swaps ("CDSs") sold by one of its subsidiaries.  These CDSs functioned like insurance policies for counterparties holding debt obligations, which in turn were often backed by subprime mortgages.  When the value of mortgage-related assets declined during the 2008 financial crisis, counterparties demanded that AIG post additional cash collateral pursuant to terms of the CDSs or, in the event of a default, pay any remaining positions.  By September 2008, AIG was also facing other financial challenges, including increased fund returns from securities lending, a significant decline in its stock price, the prospect of downgraded credit ratings, and difficulty obtaining additional funding.  These factors contributed to mounting stress on AIG's liquidity.

───────────────

[1]  The facts relied upon herein are not in material dispute unless otherwise noted.  We do not reach or endorse any other factual findings made by the Claims Court.

The situation came to a head on Friday, September 12, 2008, when AIG informed the FRBNY that it had urgent liquidity needs estimated between $13 billion–$18 billion.[2]  Over the weekend of September 13–14, AIG's liquidity needs ballooned to $45 billion, then to over $75 billion, threatening its very survival.  On the morning of Monday, September 15, another major financial institution, Lehman Brothers, filed for bankruptcy, which made obtaining private funding even more difficult.

By the following day, the FRBNY—realizing that an AIG bankruptcy could have destabilizing consequences on other financial institutions and the economy—invoked § 13(3) of the Federal Reserve Act (or "the Act"), 12 U.S.C. § 343.  That statutory provision allows the Federal Reserve Board, "[i]n unusual and exigent circumstances," to authorize a Federal Reserve Bank to provide an interest-bearing loan to a qualifying entity, "subject to such limitations, restrictions, and regulations as the [Federal Reserve Board] may prescribe."  12 U.S.C. § 343. Specifically, an entity receiving such loan must "indorse[] or otherwise secure[] [the loan] to the satisfaction of the Federal reserve bank" and show that it "is unable to

---

[2]   The FRBNY is one of twelve Federal Reserve Banks in the Federal Reserve System and is a "fiscal agent[] of the United States."  12 U.S.C. § 391; *see also Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37, 40 (2d Cir. 2014) (internal quotation marks omitted) (referring to Federal Reserve Banks as "instrumentalities of the federal government").  The Board of Governors of the Federal Reserve System ("Federal Reserve Board") is composed of seven Presidential appointees who are confirmed by the Senate.  12 U.S.C. § 241.

secure adequate credit accommodations from other bank-
ing institutions."[3]  *Id.*

The Federal Reserve Board quickly approved a Term
Sheet for an $85 billion loan under § 13(3) of the Act.  In
addition to setting forth an interest rate and various fees,
the Term Sheet provided that the FRBNY would receive
79.9% equity in AIG.

That same day, September 16, AIG's Board of Direc-
tors ("AIG Board") met to consider the proposed Term
Sheet.  They discussed the pros and cons of accepting the
loan, including the equity term.  AIG's Chief Executive
Officer ("CEO") at the time, Robert Willumstad, also
conveyed to them "that the Secretary of the Treasury had
informed him that as a condition to the [loan, he] would
be replaced as [CEO]."  J.A. 200031.  According to the

---

[3]    Section 13(3) of the Federal Reserve Act was sub-
sequently amended in 2010.  *See* Dodd-Frank Wall Street
Reform and Consumer Protection Act, Pub. L. No. 111-
203, 124 Stat. 1376 (2010).  Because the events giving rise
to Starr's claims occurred around 2008–2009, we refer to
the version of the statute in force at that time.  We note,
however, that the 2010 amendments, as well as other
legislation by Congress, imposed certain reporting re-
quirements on the Federal Reserve Board with respect to
§ 13(3) of the Act.  *See* 124 Stat. at 2114–15 (requiring the
Federal Reserve Board to report "the amount of interest,
fees, and other revenue or items of value received in
exchange for [§ 13(3)] assistance"); Emergency Economic
Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat.
3765, 3796–97 (requiring the Federal Reserve Board to
disclose any exercise of § 13(3) loan authority, including
the "recipient of warrants or any other potential equity in
exchange for [§ 13(3)] loan[s]," to Congress within seven
days).

meeting minutes, all but one of the Directors expressed the view "that despite the unfavorable terms of the [loan, it] was the better alternative to bankruptcy for [AIG]." J.A. 200038. Over the single dissenting Director, the Board voted to approve the Term Sheet. The FRBNY then advanced money to AIG for its immediate liquidity needs, and Mr. Willumstad was replaced as CEO.

On September 22, 2008, AIG entered into a Credit Agreement memorializing the terms of the loan. The Agreement specified that the Government, through "a new trust established for the benefit of the United States Treasury" ("the Trust"), would receive the 79.9% equity in the form of preferred stock that would be convertible into common stock. J.A. 200212. This was the agreement through which the Government acquired AIG equity.[4] The recited consideration for the equity was "$500,000 plus the lending commitment of [the FRBNY]." J.A. 200212. AIG issued the convertible preferred stock and placed it in the Trust in 2009.[5]

The $85 billion loan was, and remains, the largest § 13(3) loan ever granted. It is also the only instance in which the Government obtained equity as part of a § 13(3) loan.

---

[4]   Starr asserted, and the trial court found, that until the Credit Agreement of September 22, 2008, "no legally binding agreement existed between AIG and [the] FRBNY entitling the Government to an equity interest" in AIG. *Starr Int'l Co. v. United States* ("*Starr VI*"), 121 Fed. Cl. 428, 445 (2015); *see also id.* at 472 (same). We do not disturb that finding for purposes of this appeal.

[5]   After the initial $85 billion loan, the Federal Reserve provided AIG with other financial assistance that is not at issue in this appeal.

At this time, AIG's common stock was listed on the New York Stock Exchange ("NYSE"). In the latter part of 2008, AIG's stock sometimes dipped below $5.00 per share, prompting the NYSE to remind AIG that the NYSE had a minimum share-price requirement of $1.00 per share. The NYSE advised that it would delist stocks that failed to meet the $1.00-per-share requirement after June 30, 2009. By early 2009, AIG's common stock was occasionally closing below $1.00 per share and was therefore at risk of being delisted.

On June 30, 2009, the same day as the NYSE deadline, AIG held an annual shareholder meeting at which shareholders voted on a number of proposals to amend AIG's Restated Certificate of Incorporation. In relevant part, the AIG Board advised shareholders to approve two proposed amendments that would alter the pool of AIG common stock. The first proposed amendment required approval by a majority of the common shareholders (which excluded the Government at the time because it held preferred stock) and would nearly double the amount of authorized common stock from five billion shares to 9.225 billion shares. The proxy statement explained that this increase would "provide the [AIG] Board . . . the ability to opportunistically raise capital, reduce debt and engage in other transactions the [AIG] Board . . . deems beneficial to AIG and its shareholders." J.A. 201112.

The second proposed amendment was subject to a wider shareholder vote and would implement a reverse stock split at a ratio of 1:20 but would only affect the three billion issued shares out of the five billion authorized shares of common stock. The proxy statement asserted that "[t]he primary purpose of the reverse stock split [was] to increase the per share trading price of AIG Common Stock" and, accordingly, "help ensure the continued listing of AIG Common Stock on the NYSE." J.A. 201113.

The first proposed amendment, to increase the total amount of authorized common stock, failed to pass. But a majority of shareholders, including Starr, approved the second proposed amendment toward a 1:20 reverse stock split of the issued common stock. As a result, the amount of AIG issued common stock decreased from approximately three billion shares to approximately 150 million shares, while the total amount of authorized common stock remained at five billion shares. This solution avoided NYSE delisting. It also made available enough unissued shares of common stock (approximately 4.85 billion shares, i.e., over 79.9% of AIG authorized common stock) to allow the Government to convert all of its preferred stock in AIG to common stock.

More than a year later, in 2011, the Government did just that, converting its 79.9% equity from preferred stock to more than 562 million shares of AIG common stock as part of a restructuring agreement with AIG. Then, between May 2011 and December 2012, the Government sold all of those shares of common stock for a gain of at least $17.6 billion.

AIG ultimately repaid the $85 billion loan plus around $6.7 billion in interest and fees, and remains a publicly traded corporation today.

## B

Starr is a privately held Panama corporation with its principal place of business in Switzerland and was one of the largest shareholders of AIG common stock at all times relevant to this case. Its Chairman and controlling shareholder is Maurice Greenberg, who served as CEO of AIG until 2005.

In 2011, Starr filed the underlying suit in the Claims Court against the Government.[6] Starr recognizes that the § 13(3) loan to AIG was "ostensibly designed to protect the United States economy and rescue the country's financial system" but alleges that the Government used "unlawful means" in what "amounted to an attempt to 'steal the business.'" J.A. 502253, 502257.

Starr asserted claims directly—on behalf of itself and similarly situated shareholders—for individual relief. It also asserted claims derivatively, on behalf of AIG, for relief that would flow to the corporation. The Claims Court joined nominal defendant AIG as a necessary party for the derivative claims under United States Court of Federal Claims Rule ("RCFC") 19(a). *See Starr Int'l Co. v. United States* ("*Starr I*"), 103 Fed. Cl. 287 (2012). The Claims Court also certified two classes of shareholders and appointed Starr as the representative for both classes: (1) the Credit Agreement Class (generally, shareholders of AIG common stock from September 16–22, 2008, when AIG agreed to the Term Sheet and the Credit Agreement); and (2) the Stock Split Class (generally, shareholders of AIG common stock as of June 30, 2009, the date of the reverse-stock-split vote).[7] *Starr Int'l Co. v.*

---

[6]   Starr concurrently filed suit against the FRBNY in the U.S. District Court for the Southern District of New York, alleging breaches of fiduciary duty related to the § 13(3) loan and the FRBNY's subsequent actions. The district court dismissed all of those claims, and the U.S. Court of Appeals for the Second Circuit affirmed. *See Starr*, 906 F. Supp. 2d 202 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014).

[7]   More than 274,000 AIG shareholders opted into these classes under RCFC 23.

United States ("*Starr III*"), 109 Fed. Cl. 628, 636–37 (2013).

In 2013, the trial court dismissed Starr's derivative claims after the AIG Board refused Starr's demand to pursue litigation.[8]  *Starr Int'l Co. v. United States* ("*Starr IV*"), 111 Fed. Cl. 459, 480 (2013).  Starr does not appeal the dismissal of those derivative claims.  Our discussion therefore focuses on the claims that Starr, on behalf of itself and the two shareholder classes, continues to press for direct relief.

1

There are two sets of claims corresponding to the various events surrounding the § 13(3) loan to AIG: (1) the "Equity Claims" brought by the Credit Agreement Class and Starr relating to the Government's acquisition of 79.9% of AIG equity; and (2) the "Stock Split Claims" brought by the Stock Split Class and Starr relating to the 1:20 reverse stock split.  Hereinafter, references to Starr include the Credit Agreement Class and the Stock Split Class when discussing their respective claims.

───────────────

[8]   Under Delaware law, a shareholder's right to proceed with a derivative action "is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation."  *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).  "[B]y promoting [a] form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations."  *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

With respect to the Equity Claims, Starr maintains that the Government's acquisition of 79.9% of AIG's equity was an illegal exaction because the Federal Reserve Act does not authorize the Government to take equity in a corporation as part of a § 13(3) loan. Starr also asserts, in the alternative, that the Government's equity acquisition was a Fifth Amendment taking without just compensation and a violation of the unconstitutional conditions doctrine.[9]

Separately, through the Stock Split Claims, Starr alleges injuries from the 1:20 reverse stock split. Even though the proxy statement noted that the reverse stock split was aimed at avoiding NYSE delisting, Starr assigns it a more nefarious intent. According to Starr, the Government wanted to increase the relative amount of AIG's unissued common stock to above 79.9% so that it could

---

[9] The Supreme Court has called the unconstitutional conditions doctrine "an overarching principle[] . . . that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up" where it could withhold a benefit otherwise. *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2594 (2014). The Government contends that Starr invokes the unconstitutional conditions doctrine as a theory underlying a Fifth Amendment takings claim. Starr does not dispute that characterization and, indeed, refers to its "takings claim based on the imposition of an unconstitutional condition." Appellant's Opening Br. 30; *see also id.* at 54 (arguing that the unconstitutional "condition resulted in a violation of the shareholders' right to just compensation"). As a matter of convenience to distinguish Starr's claim based on the unconstitutional conditions doctrine from any other takings claim, we refer to the former as Starr's "unconstitutional conditions claim."

convert all of its preferred stock into common stock. The Government allegedly foresaw that the proposed amendment to increase the total amount of authorized AIG common stock (including unissued shares) would not pass a common shareholder vote—a vote that the Government did not control—so it "deliberately engineered" the reverse stock split to guarantee a decrease in the number of issued shares, which would result in a corresponding increase in the proportion of unissued shares to over 79.9%. J.A. 502327. Starr alleges that this scheme completed the Government's taking of shareholder interests and "deprive[d] [Starr] of its right to block further dilution of its interests in AIG." Appellant's Opening Br. 58.[10]

### 2

The Claims Court allowed Starr to proceed to trial on the claims that Starr had asserted directly. In relevant part, the court determined at the pleading stage that "Starr has standing to challenge the FRBNY's compliance with Section 13(3) of the [Act]." *Starr Int'l Co. v. United States* ("*Starr II*"), 106 Fed. Cl. 50, 62 (2012). It later reaffirmed its ruling on direct standing despite new developments asserted by the Government. *Starr IV*, 111 Fed. Cl. at 481–82. The Government moved to certify the question of direct standing for interlocutory appeal, but the trial court denied that motion, in part, to develop a "full evidentiary record" on the issue. *Starr Int'l Co. v. United States* ("*Starr V*"), 112 Fed. Cl. 601, 605–06 (2013). The trial court did not, however, revisit the question of standing after trial, noting only that it "ha[d] addressed a number of jurisdictional and standing questions at earlier stages of th[e] case." *Starr VI*, 121 Fed. Cl. at 463.

_____

[10]   For simplicity, we refer to Starr as the Appellant, even though it is also the Cross-Appellee.

On the Government's motion, the Claims Court dismissed Starr's unconstitutional conditions claim.[11]  *Starr II*, 106 Fed. Cl. at 83.  The Claims Court then proceeded to a thirty-seven-day trial on the remaining claims, all of which sought direct shareholder relief.

Following trial, the court held that the Government's acquisition of AIG equity was not permitted under the Federal Reserve Act and was therefore an illegal exaction. *Starr VI*, 121 Fed. Cl. at 466.  The court, however, declined to grant Starr any monetary relief for the adjudged illegal exaction, on the ground that "the value of the shareholders['] common stock would have been zero" absent the § 13(3) loan.  *Id.* at 474.  The court found that Starr was actually helped, rather than harmed, by the Government because by extending the $85 billion loan to AIG, "the Government significantly enhanced the value of the AIG shareholders' stock."[12]  *Id.*

The court further denied relief for the Stock Split Claims, finding that the primary purpose for the reverse stock split was to avoid delisting by the NYSE, not to avoid a shareholder vote as Starr had alleged.  *Id.* at 455–56.

---

[11]  The Claims Court also dismissed under RCFC 12(b)(1) and RCFC 12(b)(6) other claims that Starr had brought regarding the Government's acquisition of equity. *Starr II*, 106 Fed. Cl. at 83.  The dismissal of those other claims is not at issue in this appeal.

[12]  In view of its holding that the Government's acquisition of equity was an illegal exaction in violation of § 13(3) of the Federal Reserve Act, the trial court did not reach the merits of any remaining takings claim.  *Starr VI*, 121 Fed. Cl. at 472.

Starr and the Government cross-appeal from the judgment of the Claims Court. We have jurisdiction over these appeals pursuant to 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

Starr argues with respect to the Equity Claims that the trial court erred in denying monetary relief for an illegal exaction and, alternatively, in dismissing its unconstitutional conditions claim.[13] Starr separately argues that the trial court erred in denying relief for its Stock Split Claims.

The Government contends that Starr lacks standing to pursue the Equity Claims on behalf of itself and other shareholders because those claims are exclusively derivative and belong to AIG. Alternatively, the Government asks us to reverse the trial court's conclusion that the equity acquisition was an illegal exaction vis-à-vis Starr.

We review the Claims Court's conclusions of law, including that of standing, de novo. *Norman v. United States*, 429 F.3d 1081, 1087 (Fed. Cir. 2005). We review any factual findings, including those underlying the standing analysis and the denial of relief for the Stock Split Claims, for clear error. *Id.*; *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

Before we can address the merits of Starr's claims, we consider whether Starr has standing to pursue those claims directly, on behalf of itself and other shareholders.

---

[13]  Starr does not separately argue on appeal the merits of any takings claims, which the Claims Court did not reach. Oral Argument 56:42–57:25, *available at* http://oralarguments.cafc.uscourts.gov/mp3/2015-5103.mp3. It seeks a remand for further proceedings on the takings claims if we were to hold that there was no illegal exaction.

*See Castle v. United States*, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("Standing is a threshold jurisdictional issue[] . . . and therefore may be decided without addressing the merits of a determination."). For the reasons below, we conclude that it does not have direct standing to pursue the Equity Claims. Accordingly, we have no occasion in this case to address whether the Government's acquisition of AIG equity was an illegal exaction; what damages, if any, would attach; and whether the unconstitutional conditions doctrine has any applicability in this case.[14] We do, however, address the merits of Starr's appeal with respect to the Stock Split Claims.[15]

---

[14]   The Government has not pressed the issue of subject matter jurisdiction on appeal. The Concurrence would nonetheless hold that the Claims Court lacked subject matter jurisdiction over the illegal exaction claims, in part because § 13(3) of the Act supposedly does not prohibit the Government from taking equity in a private entity. Concurrence at 3–22. We need not reach those issues to resolve this case. "[T]he prudential standing doctrine[] represents the sort of 'threshold question' [the Supreme Court] ha[s] recognized may be resolved before addressing jurisdiction." *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999) ("It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits."). We see no need to take up the mantle for the Government on the alternate ground of subject matter jurisdiction—a ground that even the Concurrence believes does not resolve all of the Equity Claims—when the standing issue resolves all of the Equity Claims.

[15]   The Government does not contest Starr's standing to pursue direct relief for the Stock Split Claims because there is no dispute that at the time of the alleged injury

## A

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). In keeping with this principle, the doctrine of standing "serv[es] to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). The Claims Court, "though an Article I court, applies the same standing requirements enforced by other federal courts created under Article III." *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (citation omitted). The plaintiff bears the burden of showing standing, and because standing is "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

For a party to have standing, it must satisfy constitutional requirements and also demonstrate that it is not raising a third party's legal rights. *Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004). Unless otherwise noted below, we assume arguendo—as the parties do—that Starr has satisfied the requirements of constitutional standing derived from Article III, namely: (1) an "actual or imminent" injury-in-fact that is "concrete and particu-

---

underlying those claims, the Government had become a majority controlling shareholder and allegedly benefited by depriving minority shareholders of their interests. Oral Argument 54:02–55:57. We, too, are satisfied that Starr has direct standing to sue on the Stock Split Claims.

larized"; (2) a "causal connection between the injury and the conduct complained of"; and (3) "likely[] . . . redress[ability] by a favorable decision." *Lujan*, 504 U.S. at 560–61 (internal quotation marks omitted). We focus, instead, on the third-party standing requirement. The Concurrence faults us for not addressing constitutional standing first, but "[i]t is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits."[16] *Ruhrgas*, 526 U.S. at 585; *see,*

---

[16] On constitutional standing, the Concurrence would hold that Starr's injury was not a particularized grievance on the sole basis that AIG shareholders acknowledged being affected "'*on a ratable basis, share for share.*'" Concurrence at 30 (quoting J.A. 501694). But this case does not present a generalized grievance where the effect is "undifferentiated and common to all members of the public." *United States v. Richardson*, 418 U.S. 166, 177 (1974) (internal quotation marks omitted). Whether an injury is particularized, as opposed to generalized, does not hinge on the number of people affected or the fact that they may be similarly affected, as even "widely shared" injuries can be "particularized." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 n.7 (2016); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 35 (1998) (Scalia, J., dissenting) ("[I]t is a gross oversimplification" to dismiss "widely shared" injuries for lack of a particularized injury because "each individual" may still "suffer[] a particularized and differentiated harm."); *Lujan*, 504 U.S. at 572 (distinguishing a generalized grievance from "a case where concrete injury has been suffered by many persons as in mass fraud or mass tort situations"). Here, each AIG shareholder was affected in a proportional measure and in a way distinguishable from the rest of the public. The Concurrence further suggests that Starr may not have suffered any actual, concrete injury, by embracing the view that Starr's shares would have been "value-

*e.g.*, *Kowalski*, 543 U.S. at 129 (assuming Article III standing to "address the alternative threshold question" of third-party standing).

The Supreme Court has historically referred to the principle of third-party standing as a "prudential" principle: "that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"[17] *Kowalski*,

_____

less" absent any Government intervention whatsoever. Concurrence at 31 n.9. But the question of how much Starr's shares would have been worth absent the *dilution* caused by the Government's equity acquisition is an issue that the parties fervently dispute on appeal. Without reaching the merits of that dispute, we note the oddity of saying that the dilution of a stockholder's corporate ownership interests does not actually and concretely injure that stockholder.

[17]   The Supreme Court has, in certain circumstances, been "forgiving" of the limitation against third-party standing, *Kowalski*, 543 U.S. at 130 (collecting cases), but not in the context of the distinction between derivative and direct shareholder actions. Starr does not argue that the distinction should be relaxed here. We also recognize that prudential objectives may be overcome where "deference to [the third-party right-holder] can serve no functional purpose." *Craig v. Boren*, 429 U.S. 190, 193–94 (1976). Starr has not made that argument either. The Claims Court stated that it proceeded to trial, in part, to develop a full record regarding direct standing but never returned to that issue after trial. *See Starr V*, 112 Fed. Cl. at 605–06; *Starr VI*, 121 Fed. Cl. at 463. And the third-party right-holder, AIG, is easily identifiable and is in the sole position under principles of corporate law to decide whether or not to assert claims that belong to it.

543 U.S. at 129 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see also Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990) (calling the limitation a "longstanding equitable restriction"). This principle of third-party standing "limit[s] access to the federal courts to those litigants best suited to assert a particular claim."[18] *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979). It also recognizes that, as is the case here, the third-party right-holder may not in fact wish to assert the claim in question. *See Singleton v. Wulff*, 428 U.S. 106, 116 (1976) (distinguishing from a third-party's inability to assert a claim).

Starr submits that it satisfies the third-party standing principle because the Government's acquisition of equity harmed Starr's personal "economic and voting interests in AIG," independent of any harm to AIG. Appellant's Resp. & Reply Br. 24. The Government submits that this case presents "classic derivative claim[s]" that belong exclusively to AIG. Oral Argument 33:13–33:24.

Because Starr presses the Equity Claims under federal law, federal law dictates whether Starr has direct standing. *Cf. Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97 (1991) ("[A]ny common law rule necessary to effectuate a private cause of action . . . is necessarily federal in character."); *see also* Wright & Miller et al., Federal Practice & Procedure § 1821 ("[I]n suits in which the

---

We therefore observe that the prudential limitation maintains an important function in this case.

[18]   The Supreme Court recently shed the "prudential" label for certain other requirements of standing but did not expressly do so for the principle of third-party standing. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 & n.3 (2014).

rights being sued upon stem from federal law, federal law will control the issue whether the action is derivative."). But as the parties recognize, the law of Delaware, where AIG is incorporated, also plays a role. *See* Government's Principal & Resp. Br. 31 (stating that "[t]he principles for distinguishing direct from derivative claims are well-established and consistent across federal and state law" and applying Delaware law); Appellant's Resp. & Reply Br. 24, 26–31 (applying Delaware law for distinguishing between direct and derivative claims).

In the context of shareholder actions, both federal law and Delaware law distinguish between derivative and direct actions based on whether the corporation or the shareholder, respectively, has a direct interest in the cause of action. Under federal law, the shareholder standing rule "generally prohibits shareholders from initiating actions to enforce the rights of [a] corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." *Franchise Tax Bd.*, 493 U.S. at 336. Only "shareholder[s] with a direct, personal interest in a cause of action," rather than "injuries [that] are entirely derivative of their ownership interests" in a corporation, can bring actions directly. *Id.* at 336–37.

Under Delaware law, whether a shareholder's claim is derivative or direct depends on the answers to two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (en banc). To be direct, a claim need not be based on a shareholder injury that is "separate and distinct from that suffered by other stockholders." *Id.* at 1035 (internal quotation marks omitted). A claim may be direct even if "all stockholders are equally affected." *Id.* at 1038–39.

There exists a "presumption that state law should be incorporated into federal common law" unless doing so in a particular context "would frustrate specific objectives of the federal programs." *Kamen*, 500 U.S. at 98. And this presumption "is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards." *Id.* Relevant here, the Supreme Court has observed that "[c]orporation law is one such area." *Id.*; *see also Burks v. Lasker*, 441 U.S. 471, 478 (1979) ("Congress has never indicated that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute."). Delaware law is consistent with, and does not frustrate, the third-party standing principle under federal law. *See Kowalski*, 543 U.S. at 130 (stating that "a party seeking third-party standing" must show a "'close' relationship with the person who possesses the right" and a "'hindrance' to the possessor's ability to protect his own interests"); *Franchise Tax Bd.*, 493 U.S. at 336 (setting forth the shareholder standing rule). Accordingly, Delaware law is applicable to the question of whether the Equity Claims are direct in nature.

Although Starr claims that it was directly affected by the Government's acquisition of equity, its alleged injuries require first showing that AIG was either "caused to overpay for [the loan] that it received in exchange" for newly issued stock or forced to issue that stock without any legal basis whatsoever. *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006). Typically, "claims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative." *Id.* "Such claims are not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction."

*Id.* The proper remedy for such harms usually goes to the corporation as "a restoration of the improperly reduced value." *Id.*

The injuries that Starr alleges with respect to the Government's acquisition of AIG equity are therefore quintessentially "dependent on an injury to the corporation," and any remedy would flow to AIG. *Tooley*, 845 A.2d at 1036. Absent an applicable recognition under federal or Delaware law that Starr's alleged injuries give rise to a direct cause of action, the Equity Claims would be exclusively derivative in nature.

We make a couple of observations at the outset to provide context to our discussion. We then proceed to address whether Starr has direct standing under Delaware law to pursue the Equity Claims despite their derivative character. Finally, we consider several alternative theories of direct standing that Starr submits, including theories under federal law.

1

First, we observe that Starr does not appear to meaningfully distinguish among the various Equity Claims for purposes of standing. Rather, Starr generally characterizes the Equity Claims as alleging "the wrongful expropriation of [its] economic and voting interests in AIG for the Government's own corresponding benefit." Appellant's Resp. & Reply Br. 22. Because Starr has the burden of demonstrating standing and relies primarily on this theory of harm, we do too. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("[S]tanding cannot be inferred argumentatively from averments in the pleadings." (internal quotation marks omitted)).

Second, we address Starr's argument that its case for direct standing is particularly compelling because the Government's acquisition of newly issued equity should be equated with a physical exaction of stock directly from

AIG shareholders.  Specifically, Starr urges us to view the equity acquisition as being "indistinguishable from a physical seizure of four out of every five shares of [shareholders'] stock."  Appellant's Resp. & Reply 24–25.  To do otherwise, Starr submits, would be to "elevate form over substance."  *Id.* at 24.

We decline Starr's invitation to view the challenged conduct as it wishes.  There is a material difference between a new issuance of equity and a transfer of existing stock from one party to another.  Newly issued equity necessarily results in "an equal dilution of the economic value and voting power of each of the corporation's outstanding shares."  *Rossette*, 906 A.2d at 100.  In contrast, a transfer of existing stock creates an individual relationship between the transferor and the transferee.  Equating AIG's issuance of new equity with a direct exaction from shareholders would largely presuppose the search for a direct and individual injury—e.g., the "separate harm" that results from "an extraction from the public shareholders and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest."  *Id.*  We therefore do not equate the Government's acquisition of equity with a physical seizure of Starr's stock.

2

Having addressed the threshold issues above, we turn to Starr's primary argument for standing.  Starr submits, as the Claims Court decided at the pleading stage, that the Equity Claims fall within a "dual-nature" exception under Delaware law.

This dual-nature exception recognizes that certain shareholder claims may be "both derivative and direct in character."  *Rossette*, 906 A.2d at 99.  This exception addresses circumstances when a "reduction in [the] economic value and voting power affected the minority stockholders uniquely, and the corresponding benefit to

the controlling stockholder was the product of a breach of the duty of loyalty well recognized in other forms of self-dealing transactions." *Id.* at 102. Accordingly, shareholder claims are both derivative and direct under Delaware law when two criteria are met: "(1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value," and "(2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders." *Id.* at 100; *see also Gatz v. Ponsoldt*, 925 A.2d 1265, 1278 (Del. 2007) (same).

Starr argues that the Equity Claims fall within the dual-nature exception because the Government—though not a majority stockholder when it acquired AIG equity—was the "controlling" party that caused terms of the § 13(3) loan to be unduly favorable to itself, at the expense of AIG shareholders. To establish "control" at the time of the equity acquisition, Starr relies on the trial court's finding that the Government, "as lender of last resort," used "a complete mismatch of negotiating leverage" to "force AIG to accept whatever punitive terms were proposed" for the § 13(3) loan. *Starr VI*, 121 Fed. Cl. at 435. The trial court found that the Government had "control" in this sense starting from September 16, 2008 (the date of the Term Sheet). *Id.* at 447–48. We assume, without deciding, that the Government had such leverage over AIG as of that date.

Starr's emphasis on such leverage, however, misses the mark under the dual-nature exception's requirement for "majority or effective control." The dual-nature exception stems from a concern about the "condonation of fiduciary misconduct" at the expense of minority shareholders. *Rossette*, 906 A.2d at 102; *see also Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007) ("[I]t is clear

from [*Rossette* and *Gatz*] that the Delaware Supreme
Court intended to confine the scope of its rulings to only
those situations where a controlling stockholder exists.
Indeed, any other interpretation would swallow the
general rule that equity dilution claims are solely deriva-
tive . . . .").  Although "control" does not necessarily re-
quire the self-dealing party to be a pre-existing majority
stockholder, Delaware case law has consistently held that
a party has control only if it acts as a fiduciary, such as a
majority stockholder or insider director, or actually exer-
cises direction over the business and affairs of the corpo-
ration.  *See Feldman*, 956 A.2d at 657 (stating the "well-
established test for a controlling stockholder under Dela-
ware law"); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055
(Del. Ch. 1984) (stating that a minority shareholder may
have "control" through an "actual exercise of direction
over corporate conduct"); *see, e.g.*, *Gatz*, 925 A.2d at 1280–
81 (requiring a "fiduciary [who] exercises its control over
the corporate machinery to cause an expropriation of
economic value and voting power from the public share-
holders"); *In re Tri-Star Pictures, Inc.*, 634 A.2d 319, 329–
30 (Del. 1993) (considering whether there was "a fiduciary
relationship" before determining if shareholders suffered
individual harm); *Carsanaro v. Bloodhound Techs., Inc.*,
65 A.3d 618, 658 (Del. Ch. 2013) (extending the rationale
for the dual-nature exception to "non-controller issuances"
caused by "insider[]" directors owing fiduciary duties to
shareholders).

Outside third parties with leverage over a transac-
tion, even in a take-it-or-leave-it scenario, do not neces-
sarily have a responsibility to protect the interests of a
counterparty, less so the interests of a counterparty's
constituents.  Starr has not shown that the Government,
through its alleged leverage, owed any fiduciary duties to
Starr at the time of the equity acquisition.  *Cf. In re J.P.
Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 774–75
(Del. 2006) (observing that the dual-nature exception has

"no application . . . where the entity benefiting from the allegedly diluting transaction . . . is a third party rather than an existing significant or controlling stockholder" (alterations in original) (internal quotation marks omitted)).   Nor has Starr sufficiently shown that the Government actually exercised direction over AIG's corporate conduct, even assuming that the AIG Board was faced with a dire dilemma between accepting a § 13(3) loan or filing for bankruptcy.   While there of course may be instances in which the Government does exercise the requisite "control," the circumstances here do not arise to that level.

The Claims Court nevertheless found the Government to be "sufficiently analogous" to a party owing fiduciary duties to AIG shareholders.  *Starr II*, 106 Fed. Cl. at 65. It reasoned that the Government had a "preexisting duty" to AIG shareholders under the Fifth Amendment not to take private property for public use without paying just compensation."  *Id.*  Although Starr similarly argues that the Government had a "duty" under the Fifth Amendment, which we address in more detail below, it does not expressly defend the trial court's analogy equating the Government's role to that of a corporate fiduciary for purposes of the dual-nature exception.  *See* Appellant's Resp. & Reply Br. 26–29; Oral Argument 6:50–6:53.  Starr does not provide any controlling authority that would support the analogy.  And we see no rationale to support it.

Therefore, Starr has not demonstrated that it has direct standing to pursue the Equity Claims by virtue of the dual-nature exception under Delaware law.

3

Starr submits several other theories in the alternative to argue that it has direct, not just derivative, standing: (1) the Supreme Court recognizes that the circumstances of this case give rise to direct claims; (2) the Government

intentionally took away AIG shareholder voting rights that could have undermined the Government's interest in AIG; (3) the Government violated the Fifth Amendment rights of shareholders; and (4) the Government "direct[ly] targeted" AIG shareholders. Appellant's Resp. & Reply Br. 29–35. Starr does not frame these arguments to align with the Supreme Court's recognition that it may be necessary, in some circumstances, to grant a third party standing to assert the rights of another. *Kowalski*, 543 U.S. at 129–30. Rather, Starr attempts to bypass the third-party standing principle and submits each of these theories as an independent ground for direct standing. We address each in turn.

a

Starr argues that the Supreme Court has recognized direct standing "[i]n a case with similarities to" the instant litigation. Appellant's Resp. & Reply Br. 33. It relies on *Alleghany Corp. v. Breswick & Co.*, 353 U.S. 151 (1957), for support. We reject this argument.

Starr premises its reliance on *Alleghany* by arguing that to establish standing under federal law, "a plaintiff need only show a 'concrete and particularized' 'injury in fact' which may be redressed by a favorable decision." Appellant's Resp. & Reply Br. 33 (quoting *Lujan*, 504 U.S. at 560–61). That is a recitation of a portion of the constitutional requirements for standing. As we have already explained, though, Starr must also satisfy principle of third-party standing, not just the minimum constitutional requirements.

*Alleghany* is distinguishable and did nothing to alter the principle of third-party standing. The minority shareholders in that case filed an action against the corporation, Alleghany, to restrain it from issuing a new class of preferred stock. 353 U.S. at 153, 158–59. The shareholders also sought to set aside orders by the Interstate Commerce Commission ("ICC") approving the new

issuance (as purportedly required by statute).  *Id.*  The Supreme Court held that the threatened dilution of the minority shareholders' equity "provided sufficient financial interest to give them standing" to challenge the ICC's orders.  *Id.* at 160.

Notably, the gravamen of the dispute in *Alleghany* was between shareholders on one side and the corporation (and ICC) on the other.  The shareholders were minority stakeholders, and there is no indication that the corporation itself was harmed by the challenged conduct.  Accordingly, there was no issue as to whether the claims belonged derivatively to shareholders suing on behalf of the corporation.  As the Court observed, it was not presented with a case "where the injury feared [wa]s the indirect harm which may result to every stockholder from harm to the corporation."[19]  *Id.* at 159–60 (internal quotation marks omitted) (quoting *Pittsburgh & W. Va. Ry. Co. v. United States*, 281 U.S. 479, 487 (1930)).  The only dispute with respect to standing was whether the threatened dilution of minority shareholder interests constituted injury-in-fact, a constitutional requirement of standing.

Here, in contrast, Starr's interests are allegedly aligned with, not adverse to, the corporation.  Starr

---

[19]  As noted above, the Delaware Supreme Court has renounced distinguishing between derivative and direct actions by merely asking whether all shareholders were affected.  *See Tooley*, 845 A.2d at 1037 (calling that concept "confusing and inaccurate").  It recognizes, though, that where a "dilution in value of the corporation's stock is merely the unavoidable result . . . of the reduction in value of the entire corporate entity," a claim is "not normally regarded as direct."  *Rossette*, 906 A.2d at 99.  Delaware law is not inconsistent with *Alleghany*.

contends that the Government's acquisition of equity, in addition to injuring AIG, harmed all AIG shareholders "on a ratable basis, share for share."  J.A. 501694, 502227; *see also* Oral Argument 8:15–8:37 ("Starr was not affected differently than other shareholders with respect to the fact that it lost 80% of its voting control . . . . [I]t was not proportionally affected differently.").  We must, therefore, determine whether Starr has standing to seek direct relief, not just derivative relief, for the Equity Claims—the issue on which our standing analysis focuses.  It is not enough that, under *Alleghany*, the dilution of Starr's equity might establish injury-in-fact.

In short, the *Alleghany* Court, under very different circumstances, had no occasion to address principle of third-party standing or the distinction between derivative and direct shareholder actions.  We agree with the Government that *Alleghany* did not "spawn a separate doctrine" of direct standing or bypass the principle of third-party standing.  Oral Argument 31:38–33:24.

We are thus not persuaded that *Alleghany* grants Starr direct standing to pursue the Equity Claims.

b

Starr separately argues that it has direct standing under Delaware law because the Government "intentionally nullified" its "voting rights."  Appellant's Resp. & Reply Br. 29.  As we have noted, the general dilution of voting power that Starr complains of was dependent on AIG's equity being unlawfully taken from the corporation itself and does not also give rise to direct claims under the dual-nature exception.  We focus here, as Starr does, on another, narrower, harm that Starr alleges the AIG shareholders suffered: the loss of a common shareholder vote to block the Government's ability to obtain preferred stock and thereby "undermine the Government's interest in AIG."  *Id.* at 30 (internal quotation marks omitted).

Specifically, Starr asserts that the Government had expected to acquire warrants at the time it proposed the Term Sheet but later used its "control" of AIG to change the form of equity in the Credit Agreement to preferred stock. Starr alleges, and the trial court found, that by changing the form of equity from warrants to preferred stock, the Government avoided a common shareholder vote on whether or not the Government would have been able to exercise its warrants.[20]

The Government argues that Starr has waived any argument based on a purported deprivation of a procedural voting right to block the exercise of warrants. Having reviewed the record, we agree that Starr has waived this argument. Although the trial court found that one reason the Government obtained AIG equity in the form of preferred stock was to avoid a shareholder vote, Starr did not separately pursue direct relief on that basis.[21]

Even if Starr had preserved a claim for relief based on losing a specific shareholder vote, Starr has not shown

---

[20]   The Government also supposedly avoided a $30 billion strike price payment by obtaining AIG equity in the form of preferred stock rather than warrants. *Starr VI*, 121 Fed. Cl. at 446. To the extent the Government obtained that equity for too little compensation, that harm, as we have explained, gives rise to an overpayment claim that would belong to AIG under Delaware law. *See Rossette*, 906 A.2d at 99.

[21]   Starr's damages theory appears to undermine its allegation of a more narrow injury based on a specific voting right. Its damages theory before the trial court was consistently tied to the "market value of the [AIG stock]," J.A. 50048, not to any value representing a discrete voting right.

that that injury would give rise to a direct claim. Starr's argument in this regard rests on a single reported case, *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769 (Del. Ch. 1967). In *Condec*, the defendant corporation's management had issued equity to a third-party bidder designed to divest the plaintiff shareholder of its majority interest in the corporation and thereby thwart that shareholder's takeover bid. *Id.* at 771–73. The court in *Condec* granted relief to the frozen-out shareholder, noting that the corporation's issuance of stock "was not connected with . . . [any] proper corporate purpose" and "was clearly unwarranted because it unjustifiably str[uck] at the very heart of corporate representation." *Id.* at 777.

*Condec* is distinguishable because the Government, again, was not a fiduciary to Starr as of the date it acquired AIG equity and thus could not have violated any tenet of corporate representation. In addition, the *Condec* court did not discuss standing in any detail. *Id.* To the extent it found direct standing based entirely on the loss of a right to vote, as Starr contends, that rationale has since been rejected. The Delaware Supreme Court has held that "the concept of a 'special injury,'" including one regarding "the right to vote, or to assert majority control," "is not helpful to a proper analytical distinction between direct and derivative actions." *Tooley*, 845 A.2d at 1035 (internal quotation marks omitted). Thus, Starr's reliance on *Condec* is misplaced.[22]

_____

22 We also question whether Starr has sufficiently alleged an injury-in-fact with respect to the loss of a collective majority interest. Starr has not pointed to any competent evidence that the Credit Agreement Class was so unified that it held a majority voting block that would have undermined the Government's ability to exercise any warrants to obtain preferred stock. This alleged harm, in

Starr has neither preserved nor supported its theory that the Government's purported nullification of a collective majority voting interest is sufficient for direct standing.

c

We turn next to Starr's reliance on the Fifth Amendment as an independent basis for direct standing. This theory fares no better.

Starr argues that the Government has a duty not to violate the Fifth Amendment's Takings Clause because the Fifth Amendment creates "'a special relationship'" between AIG's shareholders and the Government. Appellant's Resp. & Reply Br. 34 (quoting *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1118 (2d Cir. 1975)). Starr does not cite any support for its submission that the Fifth Amendment's Takings Clause creates a Government "duty." And even if such a duty were to exist, Starr has not demonstrated why that duty would flow directly to a corporation's shareholders rather than the corporation in the context of an equity transaction that affects all pre-existing shareholders collaterally. *See Golden Pac. Bancorp. v. United States*, 15 F.3d 1066, 1073 & n.14 (Fed. Cir. 1994) (holding that a shareholder "has no claim independent of those of [the corporation]," even though the corporation alleged that "the government's action deprived [shareholders] of the value of their stock" (internal quotation marks omitted)). Starr, in short, has failed to carry its burden of demonstrating that the Fifth Amendment itself provides a basis for direct shareholder standing.

---

other words, appears too speculative to give rise to standing.

### d

Finally, we address Starr's contention that it has directly standing because AIG's shareholders were singled out as the "direct target[] of an illegal act."  Appellant's Resp. & Reply Br. 31.  The Government argues that "Starr's hypothesis [in this regard] is untethered to reality." Government's Reply Br. 10.  We agree with the Government.

Starr relies on the trial court's findings that "the Credit Agreement's intended punitive effect was 'immediately understood'" and that AIG shareholders "'were the parties directly affected by the Government's . . . action.'" Appellant's Resp. & Reply Br. 32–33 (quoting *Starr VI*, 121 Fed. Cl. at 447, 465).  The trial court also characterized the terms of the loan as "punitive" or "draconian" to AIG.  *See, e.g.*, *Starr IV*, 121 Fed. Cl. at 431, 435–36, 451. But Starr does not sufficiently explain why the Government's subjective motivations are relevant to the inquiry into direct standing.

And while punitive measures against a corporation may ultimately be borne by its shareholders, a finding that those measures targeted shareholders directly is a wholly different matter.[23]  To be sure, there is some testimony in the record that the Government desired to penalize AIG's shareholders.  For instance, Starr points to

---

[23]  The Government asserts that loan terms could be said to be "punitive" against shareholders without actually being intended to directly punish the shareholders.  It points, for example, to the testimony of then-Secretary of the Treasury, Henry Paulson, who said: "[The equity term of the loan] did indeed punish the shareholders.  I didn't mean that in a vindictive way . . . .  That's just the way our system is supposed to work, that when companies fail, the shareholders bear the losses."  J.A. 101243–44.

testimony purportedly showing that "[t]he Government . . . specifically said 'we want to punish [AIG] shareholders'" with the equity term.  Oral Argument 10:04–10:28; *see also id.* at 11:59–12:23; Appellant's Resp. & Reply Br. 32.  The trial court, however, did not go as far as to reach a conclusion that the Government wanted to punish AIG shareholders directly.[24]  And in our appellate function we do not make such a factual finding.  *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) (holding that a court of appeals "should not simply have made factual findings on its own"); *Atl. Thermoplastics Co. v. Faytex Corp.*, 5 F.3d 1477, 1479 (Fed. Cir. 1993) ("Fact-finding by the appellate court is simply not permitted.").

In sum, while we have no reason to doubt that Starr was affected by the Government's acquisition of AIG equity, Starr has not established any ground for direct standing under either federal or Delaware law.  The alleged injuries to Starr are merely incidental to injuries to AIG, and any remedy would go to AIG, not Starr.  The Equity Claims are therefore exclusively derivative in nature and belong to AIG, which has exercised its business judgment and declined to prosecute this lawsuit.

We need not reach the remaining issues on appeal with respect to the Equity Claims, including the question of whether the equity term was permissible under § 13(3) of the Act.  We vacate the Claims Court's decisions re-

---

[24]  The only reference in the trial court's post-trial opinion to any punitive effect on AIG's shareholders was the observation that one of Starr's experts had testified that the loan terms were punitive and imposed "on AIG's shareholders."  *Starr VI*, 121 Fed. Cl. at 460–61.  This reference appears in the trial court's summary of the record, not in its factual findings.

garding the merits of the Equity Claims, and remand for
dismissal of those claims.[25]

B

We turn now to Starr's remaining direct claims—the
Stock Split Claims based specifically on how the Govern-
ment, after obtaining AIG equity, managed to convert its
preferred stock to common stock.  Starr submits that the
Claims Court clearly erred in denying those claims based
on the record evidence.  "A finding is 'clearly erroneous'
when although there is evidence to support it, the review-
ing court on the entire evidence is left with the definite
and firm conviction that a mistake has been committed."
*Renda Marine, Inc. v. United States*, 509 F.3d 1372, 1378
(Fed. Cir. 2007) (internal quotation marks omitted) (quot-
ing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395
(1948)).

According to Starr, "the only permissible view of the
evidence is that the Government structured and timed the
reverse stock split to deprive AIG common shareholders of
their right to vote as a class to block" the Government's
exchange of preferred stock for common stock.  Appel-
lant's Resp. & Reply Br. 66.  Starr raises three features of
the reverse stock split that, contrary to the trial court's
findings, are allegedly objectionable.  First, Starr argues
that the use of the 1:20 ratio was higher than necessary to
avoid delisting.  Second, it relies on the lack of any expla-
nation for why the reverse stock split applied only to
issued shares rather than all of AIG's authorized shares.
Third, Starr asserts that the vote on the reverse stock

---

[25] In view of our decision that Starr lacks direct
standing to pursue the Equity Claims, there is no need for
further proceedings on remand regarding the merits of
those claims.

split was delayed until the last day possible to force shareholders to vote in favor of it to avoid NYSE delisting.

Despite these pieces of circumstantial evidence, the Claims Court found that there was "insufficient evidence in the record to support [the Stock Split Claims]." *Starr VI*, 121 Fed. Cl. at 455. It found that even though the reverse stock split "allow[ed] the Government to avoid a separate class vote of the common shareholders," Starr had "presented little evidence showing that the idea for the exchange preceded the reverse stock split" and was designed to avoid such a vote. *Id.* at 455–56. Instead, the court held, the "primary purpose" of the reverse stock split was to avoid a delisting on the NYSE. *Id.* at 456. It noted that "[e]very witness at trial testified unequivocally that Starr and AIG's other shareholders voted" in favor of the reverse stock split in order to avoid NYSE delisting. *Id.* at 455.

We agree with the Government that the trial court did not clearly err in finding that the reverse stock split was not a vehicle designed by the Government to obtain AIG common stock. For example, there is no dispute that the Government could have converted a substantial amount of its preferred stock into common stock even without the reverse stock split, and common shareholders, including Starr itself, voted in favor of the reverse stock split. The record also shows that the proxy statement expressly stated that the reverse stock split was aimed at avoiding NYSE delisting. And more reliably, the Government waited well over a year after the reverse stock split to convert its preferred shares—a gap in time that makes it less likely that the reverse stock split was planned to take away shareholder interests. Even if the evidence could have led a trier of fact to a different conclusion, Starr has

not persuaded us that the trial court clearly erred.[26]  *See,
e.g.*, *Fraser Constr. Co. v. United States*, 384 F.3d 1354,
1364 (Fed. Cir. 2004) (upholding factual findings under
clear-error review even though "a trier of fact could have
made a different finding").

As Starr recognizes, the reverse stock split itself was
permissible under Delaware law.  *See* 8 Del. C. § 242(b)(2)
(specifying when a separate class vote is required).  Viewing
the whole record, the Claims Court did not commit
reversible error in denying relief for the Stock Split
Claims.  We affirm that portion of the Claims Court's
judgment.

### III. CONCLUSION

For the foregoing reasons, we vacate the Claims
Court's holdings on the merits of the illegal exaction
claim, remand with instructions for dismissal of the
Equity Claims, and affirm the denial of relief with respect
to the Stock Split Claims.  After disposing of these issues,
we conclude that any remaining issues on appeal and
cross-appeal are moot.

**VACATED-IN-PART, AFFIRMED-IN-PART, AND
REMANDED**

### COSTS

Costs awarded to the United States.

---

[26]  Starr also argues that the trial court failed to con-
sider that "the Government was able to benefit from the
reverse stock split only because it was able to delay and
control that vote with the preferred stock it illegally
acquired as a result of the Credit Agreement."  Appel-
lant's Opening Br. 60.  That argument is moot in view of
our decision today vacating the determination that the
Government's acquisition of equity was illegal.

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

————————————

**STARR INTERNATIONAL COMPANY, INC., IN ITS OWN RIGHT AND ON BEHALF OF TWO CLASSES OF OTHERS SIMILARLY SITUATED,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Cross-Appellant*

**AMERICAN INTERNATIONAL GROUP, INC.,**
*Defendant*

————————————

2015-5103, 2015-5133

————————————

Appeals from the United States Court of Federal Claims in No. 1:11-cv-00779-TCW, Judge Thomas C. Wheeler.

————————————

WALLACH, *Circuit Judge*, concurring-in-part and concurring-in-the-result.

"[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (internal quotation marks and citation omitted). The

same is true of a party's standing under Article III of the Constitution.  *See Juidice v. Vail*, 430 U.S. 327, 331 (1977) ("Although raised by neither of the parties, we are first obliged to examine . . . standing . . . , as a matter of the case-or-controversy requirement associated with Art[icle] III . . . ." (citations omitted)).  Because I believe that the majority, like the U.S. Court of Federal Claims and both parties here, improperly bypasses examination of the threshold requirements of jurisdiction and constitutional standing, I write separately to express my views regarding the Court of Federal Claims's jurisdiction and Starr International Company, Inc.'s ("Starr") constitutional standing.

## DISCUSSION

I agree with the result of the majority opinion.  I also agree with the majority's thorough summary of the facts and, thus, provide only a brief summary for the necessary context here.

At the inception of what is now known as the Great Recession, American International Group, Inc. ("AIG") was on the brink of bankruptcy.  As a result, the United States ("Government") approved an $85 billion dollar loan to AIG, accepting a 79.9% equity stake in AIG as collateral.  *Starr Int'l Co. v. United States* (*Starr IX*), 121 Fed. Cl. 428, 430–31 (2015).  Starr, one of the largest shareholders of AIG common stock, alleged that that the Government's actions violated the Fifth Amendment of the Constitution as either an illegal exaction or a taking without just compensation.  *Id.* at 430.  Following several opinions and a thirty-seven day trial, the Court of Federal Claims entered final judgment, holding that the Government illegally exacted certain Starr shareholders' property but awarding zero damages; and that the Government did not illegally exact other Starr shareholders' property.

*See id.* at 475.[1]  Having found the Government liable for illegally exacting Starr's property, the Court of Federal Claims forewent consideration of Starr's taking claim. *See id.* at 472.

I believe that the Court of Federal Claims committed several errors regarding jurisdiction and standing, both as to Starr's illegal exaction and taking claims.  Although I agree with the majority's conclusion that Starr lacks standing under Delaware law, Maj. Op. 27, I also believe that the majority's failure to address the Court of Federal Claims's errors fosters uncertainty because it bypasses an important jurisdictional question and elevates state law over constitutional standing requirements.  Therefore, I first address jurisdiction and then standing.

## I. Jurisdiction

"[A] federal court [generally must] satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case."  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).  The Court of Federal Claims is no exception.  *See Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (en banc in relevant part).

As will be explained more fully below, the jurisdictional requirements for Starr's illegal exaction claim and taking without just compensation claim differ in two key respects.  First, Starr must allege a separate money-mandating source of law to invoke Court of Federal

---

[1]    The Court of Federal Claims certified two classes of shareholders, i.e., the Credit Agreement Shareholder Class and the Reverse Stock Split Shareholder Class, and reached different conclusions on the merits with respect to each.  *See Starr IX,* 121 Fed. Cl. at 475.  My analysis regarding jurisdiction and standing applies with equal force to both classes.  Therefore, I refer to both classes collectively as Starr for ease of reference.

Claims jurisdiction for its illegal exaction claim, even though it need not do so for its taking claim. Second, whether Starr's claim should be evaluated as an illegal exaction or a taking depends upon whether the Government's actions were authorized.

Therefore, I first articulate the jurisdictional requirements of the Tucker Act, including the application of the money-mandating requirement to illegal exaction and taking claims. I then explain the Court of Federal Claims's errors in finding jurisdiction. Next, I analyze the statutory provision at issue on appeal, § 13(3) of the Federal Reserve Act, 12 U.S.C. § 343 (2008)[2] ("§ 13(3)"), to determine whether it is money-mandating and what authorities it grants the Government. Finally, I apply that statutory analysis to the relevant facts to determine whether the Court of Federal Claims had jurisdiction to adjudicate Starr's illegal exaction and taking claims.

### A. Tucker Act Jurisdiction Over Illegal Exaction and Taking Claims

#### 1. The Tucker Act's Money-Mandating Requirement

"Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of waiver." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (citations omitted).[3] "The terms of consent to be sued may not

---

[2]    Section 13(3) was amended in 2010. *See* Dodd-Frank Wall Street Reform & Consumer Protection Act § 1101(a), 12 U.S.C. § 343 (2010). However, because the relevant events for the purposes of this appeal occurred in 2008 and 2009, my analysis focuses on the statutory text in effect in 2008.

[3]    While much of the Supreme Court precedent (including *White Mountain*) on Tucker Act jurisdiction

be inferred, but must be unequivocally expressed in order to define a court's jurisdiction." *Id.* (internal quotation marks, brackets, and citations omitted); *see United States v. Testan*, 424 U.S. 392, 399 (1976) ("[I]n [the] Court of [Federal] Claims context, . . . a waiver of the traditional sovereign immunity *cannot be implied* but must be unequivocally expressed." (emphasis added) (internal quotation marks and citations omitted)). "The Tucker Act contains such a waiver." *White Mountain*, 537 U.S. at 472 (citation omitted).

Pursuant to the Tucker Act, the Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act is "a jurisdictional statute; it does not create *any* substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [the Court of Federal Claims] whenever the substantive right exists." *Testan*, 424 U.S. at 398 (emphasis added) (citation omitted). To pursue a substantive right pursuant to the Tucker Act, "a plaintiff must identify a separate source of substantive law that creates the right to money damages. . . . [T]hat source must be 'money-mandating.'" *Fisher*, 402 F.3d at 1172 (citations omitted).

---

involves claims pursuant to the Indian Tucker Act, the Supreme Court's analysis under the two statutes does not differ. *See* 28 U.S.C. § 1505 (2012) (describing the Court of Federal Claims's Indian Tucker Act jurisdiction); *White Mountain*, 537 U.S. at 472 (explaining that the Indian Tucker Act is the Tucker Act's "companion statute").

Although the waiver of sovereign immunity must be unequivocal, the money-mandating source of substantive law may be implied.  In *United States v. Mitchell*, the Supreme Court held that the money-mandating source of substantive law may be implicit, reaffirming that a plaintiff "must demonstrate that the source of substantive law he relies upon can *fairly be interpreted* as mandating compensation by the Federal Government for the damages sustained."  463 U.S. 206, 216–17 (1983) (emphasis added) (internal quotation marks, citation, and footnote omitted).  Subsequently, the Supreme Court clarified the "fairly be interpreted" standard from *Mitchell* in *White Mountain*:

> This fair interpretation rule demands a showing *demonstrably lower* than the standard for the initial waiver of sovereign immunity. . . . It is enough, then, that a statute creating a Tucker Act right *be reasonably amenable to the reading* that it mandates a right of recovery in damages.  While the premise to a Tucker Act claim will not be lightly inferred, a fair inference will do.

537 U.S. at 472–73 (emphases added) (internal quotation marks and citations omitted).

2. The Application of the Tucker Act's Money-Mandating Requirement to Illegal Exaction and Taking Claims

Both illegal exaction and taking claims derive from the Fifth Amendment.  The Takings Clause of the Fifth Amendment inherently is money-mandating.  *See Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008) ("It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction.").  However, we have not clearly explained whether the same is true for illegal exaction claims, *see Starr IX*, 121 Fed. Cl. at 464–65 (discussing apparent inconsistencies in our court's application of the money-mandating

requirement to illegal exaction claims), which "involve[] a deprivation of property without due process of law, in violation of the Due Process Clause of the Fifth Amendment," *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005).

Although the Takings Clause provides that "private property [shall not] be taken for public use[] *without just compensation*," the Due Process Clause does not similarly contemplate money damages.   U.S. Const. amend. V (emphasis added); *see In re United States*, 463 F.3d 1328, 1335 n.5 (Fed. Cir. 2006) ("[B]ecause the Due Process Clause is not money-mandating, it may not provide the basis for jurisdiction under the Tucker Act."); *Murray v. United States*, 817 F.2d 1580, 1583 (Fed. Cir. 1987) ("Although the Fifth Amendment's [D]ue [P]rocess [C]lause provides that no person shall be deprived of property without due process of law, no language in the clause itself requires the payment of money damages for its violation." (citation omitted)).   This means that a party bringing an illegal exaction claim must identify a separate money-mandating source of substantive law entitling it to compensation. *See White Mountain*, 537 U.S. at 472.

Indeed, the weight of our illegal exaction case law supports this conclusion. *See, e.g., Norman*, 429 F.3d at 1095 ("To invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted." (internal quotation marks and citation omitted)); *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000) (explaining that the appeal "turns on whether [the Export Clause, U.S. Const. art. I, § 9, cl. 2], when fairly interpreted, affords an independent cause of action for monetary remedies" and then finding jurisdiction because this interpretation "leads to the ineluctable conclusion that the clause provides a

cause of action with a monetary remedy," i.e., the "return of money unlawfully exacted"); *Crocker v. United States*, 125 F.3d 1475, 1476–77 (Fed. Cir. 1997) (per curiam) ("Because the Tucker Act does not provide any substantive rights, [the plaintiff]'s ability to bring a claim in the Court of Federal Claims turns on whether [the relevant statute] creates a substantive right for money damages in situations in which a penalty is improperly exacted." (internal quotation marks and citations omitted)); *Murray*, 817 F.2d at 1583 (stating that the Claims Court did not have jurisdiction because "there is no language in the statute requiring compensation"). Moreover, if the money-mandating requirement did not apply to illegal exaction claims, then any Government violation of a constitutional provision, statute, or regulation could result in a claim for money damages against the Government. The law does not support such a result. *See, e.g.*, *Lane v. Pena*, 518 U.S. 187, 196 (1996) ("It is plain that Congress is free to waive the Federal Government's sovereign immunity against liability without waiving its immunity from monetary damages awards.").

It is regrettable that the majority chooses to bypass this opportunity to clarify the law for future cases. Rather than forego this opportunity, I would find that illegal exaction claims are not inherently money-mandating and that, consequently, Starr was required to plead a separate money-mandating source of substantive law.

## B. The Court of Federal Claims Erred in Its Jurisdictional Findings

In *Fisher*, this court held that "[w]hen a complaint is filed alleging a Tucker Act claim . . . , the trial court *at the outset* shall determine, either in response to a motion by the Government or *sua sponte* (the court is always responsible for its own jurisdiction), whether the Constitutional provision, statute, or regulation is one that is money-mandating." 402 F.3d at 1173 (emphasis added)

(citation omitted). We further explained that "the determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and . . . whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action." *Id.* "[T]he absence of a money-mandating source [is] fatal to the court's jurisdiction under the Tucker Act," requiring dismissal. *Id.*

Instead of determining whether a money-mandating statute is required for an illegal exaction claim *at the outset*, the Court of Federal Claims in the instant action deferred this determination for its final merits opinion. *See Starr IX*, 121 Fed. Cl. at 463–64 (noting that "there is one jurisdictional issue where the Court previously granted an inference in Starr's favor, but which now requires further analysis"); *Starr Int'l Co. v. United States* (*Starr II*), 106 Fed. Cl. 50, 84 (2012) ("[T]he [c]ourt concludes that it is premature at this stage to rule decisively on the issue [of whether § 13(3) is money-mandating], let alone treat it as dispositive for purposes of Starr's illegal exaction claim."). The result of that analytical deferral was a thirty-seven day trial involving three Cabinet-level officials and five years of costly litigation. *See Starr IX*, 121 Fed. Cl. at 431–32.

In its ultimate post-trial jurisdictional findings, the Court of Federal Claims recognized that "taking claims stem from explicit money-mandating language in the Fifth Amendment, while illegal exaction claims do not." *Id.* at 464.[4] The Court of Federal Claims then identified

---

[4] The Court of Federal Claims made this determination after reaching inconsistent positions as to whether an illegal exaction claim requires a money-mandating source: in one opinion, it held that an illegal exaction claim "is an exception to the general rule that the Due Process Clause of the Fifth Amendment is not money-

apparent inconsistencies in our precedent, stating that "some decisions have dispensed with the requirement for a money-mandating statute, seemingly embracing the concept that the Government should not escape responsibility for its unauthorized actions based on a jurisdictional loophole," *id.*, while "[o]ther decisions have espoused a slightly tighter standard, but one that is still broader than simply requiring a 'money-mandating' source of law," *id.* at 465. The Court of Federal Claims found that Starr's illegal exaction claims satisfied this broader jurisdictional threshold. *Id.* at 465–66.

In support, the Court of Federal Claims relied on language from our decision in *Norman*, which states that a plaintiff "must demonstrate that the statute or provision causing the exaction [must] itself provide[], either expressly *or by necessary implication*, that the remedy for its violation entails a return of money unlawfully exacted." 429 F.3d at 1095 (emphasis added) (internal quotation marks and citation omitted). On this basis, the Court of Federal Claims determined that

> where the Government has imposed unlawful conditions in connection with an emergency loan under [§] 13(3) of the Federal Reserve Act, the Government *should not* be permitted to insulate itself from liability by arguing that [§] 13(3) is not "money-mandating." If this were true, the Government could nationalize a private company, *as it did to AIG*, without fear of any claims or reprisals. Section 13(3) *does not contain any express*

mandating," *Starr II*, 106 Fed. Cl. at 61, but it later reached the opposite conclusion, *Starr IX*, 121 Fed. Cl. at 464 ("The Due Process Clause does not contain a money-mandating provision, and therefore an illegal exaction claim requires reference to another statute or regulation to create jurisdiction in this [c]ourt.").

"*money-mandating*" *language*, but "by necessary implication," the statute *should* be read to allow the shareholders' cause of action here.  By taking 79.9 percent equity and voting control of AIG, the Government *exacted* the shareholders' property interests.  The two certified classes of AIG common stock shareholders were the parties directly affected by the Government's unlawful action, and "by necessary implication," they *should* be permitted to maintain their lawsuit.

*Starr IX*, 121 Fed. Cl. at 465 (emphases added).  In addition to disregarding the en banc court's instructions in *Fisher* to decide jurisdiction at the outset, the Court of Federal Claims's reasoning suffers from five separate defects.

As an initial matter, when asked to reconsider whether § 13(3) is money-mandating, the Court of Federal Claims stated that it "must draw all reasonable inferences in favor of" Starr and, thus, concluded that "at this stage Starr is entitled to the inference that [§] 13(3) is indeed money-mandating."  *Starr Int'l Co. v. United States* (*Starr III*), 107 Fed. Cl. 374, 378 (2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  However, *Iqbal* refers to *factual*, not *legal*, inferences.  *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (citation omitted)).  Indeed, the Supreme Court has explained that allegations in a complaint must rest on a plausible legal theory to survive dismissal in the early stages of litigation.  *See, e.g.*, *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471–72 (2014).

Second, the Court of Federal Claims never found that Starr met its burden of establishing jurisdiction by a preponderance of the evidence.  *See Reynolds v. Army &*

12                    STARR INTERNATIONAL COMPANY v. US

*Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." (citations omitted)).  Without the requisite evidence, the Court of Federal Claims may not exercise jurisdiction. *See M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010).

Third, the Court of Federal Claims simply repeated one phrase from *Norman* as purported support for its erroneous interpretation of the money-mandating jurisdictional requirement.  *See Starr IX*, 121 Fed. Cl. at 465.  Had the Court of Federal Claims reviewed the array of available case law on Tucker Act jurisdiction, it must have found to the contrary.  *See, e.g.*, *Cyprus*, 205 F.3d at 1373; *Crocker*, 125 F.3d at 1476–77.  In fact, in *Norman*, we affirmed the Court of Federal Claims's dismissal of the illegal exaction claim for lack of jurisdiction because the statute at issue "*d*[*id*] *not*, by its terms or by necessary implication, *provide* a cause of action with *a monetary remedy* for its violation."  429 F.3d at 1096 (emphases added).  *Norman*—as well as the weight of our illegal exaction case law—requires plaintiffs to identify a money-mandating source of substantive law.  *See supra* Section I.A.2.

Fourth, the Court of Federal Claims's legal reasoning is based on that court's own theory of equity.  While acknowledging that § 13(3) "does not contain express money-mandating language," the Court of Federal Claims simply repeated what the court believed "should" happen. *Starr IX*, 121 Fed. Cl. at 465 (internal quotation marks omitted).  But what a law "should" do and what it does are often two different questions.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014) ("We do not ask whether in our judgment Congress *should* have authorized [the plaintiff]'s suit, but whether Congress in fact did so.").  The test is whether the statute is "reasonably amenable to the reading that it mandates a

right of recovery in damages," *White Mountain*, 537 U.S. at 473, and the Court of Federal Claims did not apply that test.

Fifth, the Court of Federal Claims incorrectly tethered its money-mandating determination to the facts of this case, *see Starr IX*, 121 Fed. Cl. at 463–64; *Starr II*, 106 Fed. Cl. at 84, but the correct inquiry is *whether § 13(3) itself is money-mandating* irrespective of the facts in a given dispute, *see Fisher*, 402 F.3d at 1173.  As a result, the Court of Federal Claims incorrectly based its money-mandating finding on its post-facto determination that the Government took unauthorized action, *see Starr IX*, 121 Fed. Cl. at 465 (stating that "the Government could nationalize a private corporation, *as it did to AIG*, without fear of any claims or reprisals" (emphasis added)), when it should have focused on interpreting the language of the statute to determine Congressional intent.  This inquiry  neither requires nor permits such considerations.

Taken together, these reasons not only warrant, but require, reversal of the Court of Federal Claims's finding of jurisdiction over Starr's illegal exaction claim.  Nevertheless, I continue by evaluating § 13(3) under the appropriate standard to determine its effect on Starr's claims.

## C. Statutory Interpretation of § 13(3) of the Federal Reserve Act

In this section, I discuss § 13(3) to determine its content and scope.  Based on that analysis, I then evaluate in subsequent sections whether § 13(3) is money-mandating and whether it authorizes the taking of an equity stake (e.g., shares or stock warrants).

### 1. The Text of § 13(3) of the Federal Reserve Act

"[O]ur inquiry begins with the statutory text." *Bed-Roc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (citations omitted).  Section 13(3), in relevant part, provides:

> In *unusual and exigent circumstances*, the Board of Governors of the Federal Reserve System [("BoG")], by the *affirmative vote* of not less than five members, may authorize any Federal [R]eserve bank, during such periods as the said [BoG] may determine, *at rates established in accordance with the provisions of [§] 357 of this title, to discount for any individual, partnership, or corporation, notes, drafts, and bills of exchange* when such notes, drafts, and bills of exchange are *indorsed or otherwise secured to the satisfaction of the Federal [R]eserve bank: Provided*, That before discounting any such note, draft, or bill of exchange for an individual or a partnership or corporation the Federal [R]eserve bank *shall obtain evidence that such individual, partnership, or corporation is unable to secure adequate credit accommodations from other banking institutions.* All such discounts for individuals, partnerships, or corporations *shall be subject to such limitations, restrictions, and regulations as the [BoG] may prescribe.*

12 U.S.C. § 343 (emphases added).  The statute authorizes the Federal Reserve banks "to discount . . . notes, drafts, and bills of exchange," i.e., to make an interest bearing loan, to individuals, partnerships, and corporations.  *Id.*  However, this authority is subject to certain conditions precedent to making a loan, as well as certain requirements regarding the terms of the loan.

### a. Conditions Precedent to Making a Loan

Section 13(3) includes three conditions precedent: (1) the existence of "unusual and exigent circumstances"; (2) an "affirmative vote" of at least five members of the BoG authorizing a Federal Reserve bank to take action permitted by the statute; and (3) "evidence that [an] individual, partnership, or corporation is unable to secure

adequate credit accommodations from other banking institutions." *Id.*; *see* 12 C.F.R. § 201.4(d) (2008) (stating that a Federal Reserve bank must determine that "failure to obtain such credit would adversely affect the economy" before extending emergency credit). Considered together, these conditions require that, during "unusual and exigent circumstances," at least five members of the BoG must vote to authorize a Federal Reserve bank to make a loan, and then the authorized Federal Reserve bank must obtain evidence demonstrating that the borrower could not obtain financing from another banking institution. In effect, the Federal Reserve bank must be a lender of last resort.

### b. Restrictions on the Loan's Terms

Section 13(3) also places three restrictions on the terms of a loan: a loan must be (1) "at rates established in accordance with the provisions of [§] 357 of this title"; (2) "indorsed or otherwise secured to the satisfaction of the Federal [R]eserve bank"; and (3) "subject to such limitations, restrictions, and regulations as the [BoG] may prescribe." 12 U.S.C. § 343. As to the first restriction, § 357 provides that "[e]very Federal [R]eserve bank shall have power to establish . . . , subject to review and determination of the [BoG]," interest rates "to be charged by the Federal [R]eserve bank for each class of paper, which shall be fixed with a view of accommodating commerce and business." *Id.* § 357. Therefore, Federal Reserve banks must establish interest rates for a § 13(3) loan that "accomodat[e] commerce and business." *Id.*

Second, the § 13(3) loan must be "indorsed or otherwise secured to the satisfaction of the Federal [R]eserve bank." *Id.* § 343. Although this provision requires the Federal Reserve bank to secure the loan, it grants the Federal Reserve bank discretion by requiring that the loan be "secured to *the satisfaction of the Federal [R]eserve bank.*" *Id.* (emphasis added). In addition, the use of

"otherwise" permits the Federal Reserve bank to exercise this discretion in selecting the form of security.

Third, the BoG "*may* prescribe" "limitations, restrictions, and regulations" on the Federal Reserve bank's loan. *Id.* (emphasis added). Because this provision employs permissive rather than mandatory language, the BoG has discretion over whether to prescribe additional limitations, restrictions, and regulations. Thus, this provision only is relevant when the BoG has elected to do so.

### 2. Other Provisions of the Federal Reserve Act

Because "[s]tatutory construction . . . is a holistic endeavor," *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988), "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy," *United States v. Boisdoré's Heirs*, 49 U.S. (8 How.) 113, 122 (1849). Thus, I evaluate how § 13(3) fits into the statutory scheme of Federal Reserve Act generally.

When Congress passed the Federal Reserve Act in 1913, it conferred certain authority on Federal Reserve banks. *See generally* Pub. L. No. 63-43, 38 Stat. 251 (1913) (codified as amended in scattered sections of 12 U.S.C.). As relevant here, § 4(4) provides that the Federal Reserve banks

shall have power—

. . .

[t]o exercise by its board of directors, or duly authorized officers or agents, all powers specifically granted by the provisions of [the Federal Reserve Act] and *such incidental powers as shall be necessary to carry on the business of banking* within the limitations prescribed by the [Federal Reserve Act].

12 U.S.C. § 341 (emphasis added).   Section 4(4) thus
expands upon the powers "specifically granted" by § 13(3)
by granting "such incidental powers as shall be necessary
to carry on the business of banking."   *Id.*

However, the statutory text limits these additional
powers in two ways.  First, the powers are "incidental,"
and "an incidental power can avail neither to create
powers which, expressly or by reasonable implication, are
withheld nor to enlarge powers given; but only to carry
into effect those which are granted."  *First Nat'l Bank in
St. Louis v. Mo.*, 263 U.S. 640, 659 (1924).  Second, the
incidental powers must be "within the limitations pre-
scribed by the [Federal Reserve Act]," meaning they
cannot contravene the limitations of § 13(3) and the
remainder of the statute.   Section 4(4) thus authorizes
Federal Reserve banks to perform certain activities
"necessary" to "the business of banking," but these powers
cannot exceed the authorized powers of the statute.

### 3. Similar Provisions in Statutes Related to § 13(3)

The interpretation of particular text from related
statutes in the same Title of the United States Code also
may inform the interpretation of the same or similar text
in the statute at issue.  *See Sullivan v. Stroop*, 496 U.S.
478, 484 (1990) (interpreting "child support" in accord-
ance with a closely-related statute using the same
phrase).  Relevant here, § 16 of the Banking Act of 1933,
Pub. L. No. 73-66, 48 Stat. 162, 184–85 (codified as
amended at 12 U.S.C. § 24), appears in the same title of
the United States Code as §§ 4(4) and 13(3) of the Federal
Reserve Act and is structured similarly to § 4(4), includ-
ing the phrase "all such incidental powers as shall be
necessary to carry on the business of banking."  12 U.S.C.
§ 24.  One notable difference between 12 U.S.C. § 24 and
§ 4(4) of the Federal Reserve Act, however, is that § 24
does not provide that incidental powers must be carried
out "within the limitations prescribed by the [Federal

Reserve Act]" like § 4(4).  *Compare* 12 U.S.C. § 24*, with id.* § 341.

The regulation interpreting the "incidental powers" provision of 12 U.S.C. § 24 states that

> [a] national bank may take as consideration for a loan a share in the profit, income, or earnings from a business enterprise of a borrower.  A national bank also may take as consideration for a loan a stock warrant issued by a business enterprise of a borrower, provided that the bank does not exercise the warrant.  The share or stock warrant *may be taken in addition to, or in lieu of, interest.*

12 C.F.R. § 7.1006 (emphasis added).  This regulation indicates that "incidental powers" may include, at a minimum, taking shares or stock warrants "in addition to, or in lieu of, interest."  *Id.*  To the extent 12 U.S.C. § 24 and 12 C.F.R. § 7.1006 inform the interpretation of the Federal Reserve Act, this analysis would not differ with respect to §§ 13(3) or 4(4), unless the Federal Reserve bank was not acting "within the limitations" of other provisions of the Federal Reserve Act.

### 4. Legislative History

Although of lesser interpretative value, courts frequently rely on legislative history.  *See, e.g.*, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 209 (1994) ("The legislative history of the Mine Act confirms this interpretation.").  I have not identified any legislative history relevant to my interpretation of § 13(3).

### 5. Additional Considerations Related to § 13(3)

Finally, although not central to my interpretation, it is worth noting that § 13(3) of the Federal Reserve Act was enacted in 1932 at the height of the Great Depression.  *See* Pub. L. No. 72-302, § 210, 47 Stat. 709, 715

(1932).   While it was used over 100 times during the height of the Great Depression, the Court of Federal Claims found (and the parties do not contest) that the Federal Reserve Act was not used during the seventy-two years preceding the Great Recession of 2008.  *See Starr IX*, 121 Fed. Cl. at 467.  This lends mild support for an interpretation favoring broader powers, as the Federal Reserve Act was designed to prevent or mitigate significant financial crises.  *But cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring).

## D. The Court of Federal Claims Did Not Have Jurisdiction to Adjudicate Starr's Illegal Exaction Claim

The Court of Federal Claims is a court of limited jurisdiction, as provided for by the Tucker Act.  *See* 28 U.S.C. § 1491.  To bring an illegal exaction claim pursuant to the Tucker Act, our precedent requires a plaintiff to assert a money-mandating source of substantive law and a violation of the Constitution, a statute, or a regulation. Because § 13(3) neither is money-mandating nor prohibits the Federal Reserve banks from taking equity, the Court of Federal Claims did not have Tucker Act jurisdiction to adjudicate Starr's illegal exaction claim.  I address these issues in turn.

### 1. Section 13(3) Is Not Money-Mandating as Required for Court of Federal Claims Jurisdiction Pursuant to the Tucker Act

When determining whether a statute is money-mandating, we ask whether the statute is "reasonably amenable to the reading that it mandates a right of recovery in damages."  *White Mountain*, 537 U.S. at 473. Based on my review of the text of § 13(3), I agree with the Court of Federal Claims that "[§] 13(3) does not contain express 'money-mandating' language . . . ."  *Starr IX*, 121 Fed. Cl. at 465.  There simply is no language in the statute discussing the Government's payment of money

damages.  Nor is § 13(3) "reasonably amenable" to such a reading.  *White Mountain*, 537 U.S. at 473.  Section 13(3) permits Federal Reserve banks to serve as a lender of last resort in "unusual and exigent circumstances."  12 U.S.C. § 343.  It empowers the Federal Reserve banks to mitigate financial crises; it does not enable a borrower to bring a money claim (or any other claim) against the Federal Reserve banks or any other Government entity.  Therefore, even if the Government violated § 13(3), it would not be obligated to pay money damages.

### 2. The Government's Actions Were Authorized Because § 13(3) Does Not Prohibit the Taking of Equity

The Court of Federal Claims lacked jurisdiction over Starr's illegal exaction claim for the separate reason that Congress authorized the Government to take equity via § 13(3).  Illegal exaction claims depend upon *unauthorized* Government conduct, *see Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967) (stating that illegal exaction claims may be brought when money "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation"), but "[t]he [G]overnment action upon which the taking[] claim is premised must be *authorized*, either expressly or by necessary implication, by some valid enactment of Congress," *Short v. United States*, 50 F.3d 994, 1000 (Fed. Cir. 1995) (emphasis added).  The Government's action here, i.e., the taking of an equity stake, was authorized pursuant to § 13(3).

Although § 13(3) does not reference the taking of equity in a company expressly, the statute gives the Federal Reserve banks discretion on how the loan is secured.  Section 13(3) places two primary restrictions on the terms of a loan.  First, the Federal Reserve banks must make loans "at rates established in accordance with the provisions of [§] 357 of this title."  12 U.S.C. § 343.  While this prohibits the Federal Reserve banks from setting interest

rates that do not "accommodat[e] commerce and business," *id.* § 357, it does not prohibit the Federal Reserve banks from obtaining other forms of security. Second, these loans must be "indorsed or otherwise secured to the satisfaction of the Federal [R]eserve bank." *Id.* § 343. By stating that the loan may be "otherwise secured to the satisfaction of the Federal [R]eserve bank," § 13(3) gives the Federal Reserve bank discretion over the form and amount of the security obtained from the borrower. Providing equity is a common method for securing a loan. *See, e.g.*, J.A. 400175 (stating that taking equity is "common practice in the banking industry"). Thus, obtaining equity as collateral falls within the powers authorized by § 13(3).

The inquiry may not end there, however, as the statute must be viewed as a whole. *United Sav. Ass'n*, 484 U.S. at 371. Viewing the statute as a whole reinforces this interpretation. Section 4(4) of the Federal Reserve Act expands upon the powers "specifically granted" by § 13(3) by granting "such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 341. It is true that incidental powers may not exceed the authorized powers, but § 13(3) provides the Federal Reserve banks with the power to lend and grants significant discretion to formulate loan terms. Accepting equity as collateral for a loan would not exceed the Federal Reserve banks' lending power; it would enable lending. *See NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 258 n.2 (1995) (Section 24 does not limit an official's authority "to the enumerated powers" in that statute, because the official "has discretion to authorize activities beyond those specifically enumerated," so long as that discretion is "kept within reasonable bounds. Ventures distant from dealing in financial investment instruments—for example, operating a general travel agency—may exceed those bounds.").

Considering the entire statutory framework, I would find that § 13(3) is not money-mandating and otherwise authorizes Federal Reserve banks to take equity to secure loans.  Because Starr's illegal exaction claim was premised on the purported money-mandating nature of § 13(3) and the Government's purported violation of § 13(3) by taking a 79.9% equity stake in AIG, the Court of Federal Claims lacked jurisdiction to adjudicate Starr's illegal exaction claim.[5]

### E. The Court of Federal Claims Had Jurisdiction to Adjudicate Starr's Taking Claim

Having found the Government liable for illegally exacting Starr's property, the Court of Federal Claims forewent consideration of Starr's taking claim under the Fifth Amendment.  *See Starr IX*, 121 Fed. Cl. at 472 (determining that Starr's taking claim could not be decided due to the finding of an illegal exaction, because "the same government action cannot be both an unauthorized illegal exaction and an authorized taking").  Because I

---

[5]  In reaching its conclusion that the Federal Reserve Bank of New York ("FRBNY") violated § 13(3), the Court of Federal Claims cited *draft* memoranda, which it believed indicated positions taken by Mr. Scott Alvarez, General Counsel to the Federal Reserve.  *Starr IX*, 121 Fed. Cl. at 469–70, 478.  However, ample record evidence demonstrates that these were drafts authored by subordinates and were never authorized by Mr. Alvarez.  *See, e.g.*, J.A. 300162–67 (handwritten markup striking statement indicating that the Federal Reserve and the Treasury could not hold shares with voting rights); *see also* J.A. 100566 ("I didn't agree with that part of the memo or whole other parts of the memo, and, indeed, I struck— once I had the opportunity to read this, I struck whole parts of the memo, including that discussion.").  This constitutes clear error by the Court of Federal Claims.

would find that Starr's illegal exaction claim must be dismissed for lack of jurisdiction, I now turn to whether the Court of Federal Claims had jurisdiction to adjudicate Starr's taking claim.

The Fifth Amendment provides, inter alia, that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. Because the Takings Clause inherently is money-mandating, *see Jan's Helicopter*, 525 F.3d at 1309, Starr was not required to allege a separate money-mandating source of law. Instead, Starr was only required to (1) "identif[y] a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking" and (2) plead that the "property interest was 'taken'" without just compensation through authorized Government action. *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009); *see Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998) ("A compensable taking arises only if the government action in question is authorized.").

Starr satisfied these requirements. As to the cognizable property interest, "a court must look to existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law, that define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." *Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 511 (Fed. Cir. 2011) (internal quotation marks, brackets, and citation omitted). Shares and voting power are property interests pursuant to Delaware law. *See, e.g.*, Del. Code Ann. tit. 8, § 159 (West 1983) ("The shares of stock in every corporation shall be deemed personal property . . . ."); *Gatz v. Ponsoldt*, 925 A.2d 1265, 1278 (Del. 2007) (discussing voting power). Starr thus alleged a cognizable property interest by claiming dilution and loss of voting power. Starr also alleged that the Government took 562,868,096 shares of AIG common stock

without due process or just compensation.  *Starr II*, 106
Fed. Cl. at 54.  Finally, as explained above, the Govern-
ment's actions were authorized under § 13(3).  *See supra*
Section I.D.2.  For these reasons, the Court of Federal
Claims had jurisdiction to adjudicate Starr's taking claim.

### III. Standing

Having determined that the Court of Federal Claims
did not have jurisdiction to adjudicate Starr's illegal
exaction claim but that it did have jurisdiction to adjudi-
cate Starr's taking claim, I now turn to whether Starr had
standing to bring its taking claim in federal court.[6]
"Standing represents a jurisdictional requirement which
remains open to review at all stages of the litigation."
*Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255
(1994) (citation omitted).

"The party invoking federal jurisdiction bears the
burden of establishing" standing, *Lujan v. Defs. of Wild-
life*, 504 U.S. 555, 561 (1992), and this burden increases
as the litigation progresses:

> At the pleading stage, general factual allegations
> of injury resulting from the defendant's conduct
> may suffice . . . .  In response to a summary judg-
> ment motion . . . , the plaintiff can no longer rest
> on such mere allegations, but must set forth by af-
> fidavit or other evidence specific facts . . . .  And at
> the final stage, those facts (if controverted) must

---

[6]   The parties briefed standing with respect to the
illegal exaction claim rather than the taking claim, but I
see no substantive difference in how this would affect the
standing analysis.  Therefore, even if the Court of Federal
Claims had jurisdiction over Starr's illegal exaction claim,
my standing analysis would apply with equal force to that
claim.

be supported adequately by the evidence adduced at trial.

*Id.* (internal quotation marks and citations omitted).  The Court of Federal Claims addressed standing over five opinions.[7]   However, as will be explained more fully below, the Court of Federal Claims never conducted a standing analysis pursuant to the three elements prescribed by the Constitution, and it only addressed whether the Government had the requisite control to form the

---

[7]   In *Starr Int'l Co. v. United States* (*Starr I*), the Court of Federal Claims "reserve[d] judgment as to the scope of its jurisdiction and to Starr's standing" pending the filing of the Government's motion to dismiss.  103 Fed. Cl. 287, 289 n.1 (2012).  In *Starr II*, the Court of Federal Claims determined that "Starr has pled facts sufficiently alleging . . . harm to the suing stockholders independent of any harm to AIG and as such, has standing to advance its expropriation claim directly" and that "Starr has standing to challenge the FRBNY's compliance with [§] 13(3) of the [Federal Reserve Act]."  106 Fed. Cl. at 62, 84.  It then declined to reconsider these findings in *Starr III*, 107 Fed. Cl. at 379.  In *Starr Int'l Co. v. United States* (*Starr V*), after AIG's Board declined to bring a derivative claim against the Government, the Court of Federal Claims held that "Starr has not demonstrated a reasonable doubt that the Board's decision is entitled to the presumption of the business judgment rule, and therefore has no standing to advance derivative claims on behalf of AIG."  111 Fed. Cl. 459, 469 (2013).  In addition, it "repeat[ed] its previous ruling that Starr has standing to pursue its illegal exaction claim."  *Id.* at 482.  Finally, in *Starr IX*, the Court of Federal Claims simply noted that it "ha[d] addressed a number of jurisdictional and standing questions at earlier stages of this case."  121 Fed. Cl. at 463.

basis of a direct claim, as required by Delaware law, at the pleading stage of the litigation.  The majority commits the same error here, Maj. Op. 17 (articulating the three elements of constitutional standing and stating "we assume arguendo—as the parties do—that Starr has satisfied the requirements of constitutional standing derived from Article III"), despite Supreme Court precedent cautioning against such assumptions, *see, e.g.*, *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94–97 (1998) (criticizing the appellate court for "'assuming' jurisdiction" rather than deciding jurisdictional issues such as Article III standing at the outset).[8]  I first provide additional

---

[8]   In justifying its disregard for constitutional standing, the majority acknowledges that "federal law dictates whether Starr has direct standing" but states that "the law of Delaware . . . also plays a role."  Maj. Op. 20, 21.  Undoubtedly, state law may play a role—a secondary one.  *See* U.S. Const. art. VI, cl. 2 ("This Constitution . . . shall be the supreme Law of the Land[,] and the [j]udges in every [s]tate shall be bound thereby . . . ."); *Armstrong v. Exceptional Child Ctr.*, 135 S. Ct. 1378, 1383 (2015) (explaining that courts "must not give effect to state laws that conflict with federal laws" (citation omitted)).  The majority characterizes its analysis as one involving prudential considerations, but I disagree with its analysis for three reasons.

First, the majority appears to believe that Delaware law provides the applicable test for the prudential consideration of third-party standing.  *See* Maj. Op. 21–27.  However, federal law provides its own test for third-party standing, *see Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004) ("[A] party seeking third-party standing [must] make two additional showings [in addition to the requirements of Article III].  First, we have asked whether the party asserting the right has a 'close' relationship with the person who possesses the right.  Second, we have

considered whether there is a 'hindrance' to the possessor's ability to protect his own interests." (citation omitted)), and the majority leaves unanswered the question of how these federal law requirements apply to Starr's claim.

Second, the substance of the majority's analysis is on state law, not concepts historically characterized as threshold prudential considerations in light of the Constitution. *See* Maj. Op. 21–27. However, the Supreme Court has differentiated between prudential and state law standing requirements, explaining that constitutional and prudential considerations prevail over state law considerations. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 n.8 (1977) ("State law of standing, however, does not govern such determinations in federal courts. The constitutional and prudential considerations . . . respond to concerns that are peculiarly federal in nature." (citation omitted)); *see also Lexmark*, 134 S. Ct. at 1386, 1388 (explaining that the prudential standing label is "misleading" and that the relevant inquiry is "the meaning of the congressionally enacted provision creating a cause of action"); *id.* at 1387 n.4 (providing additional commentary on prudential considerations). Congress, not state courts, is responsible for establishing the bounds of these prudential considerations within Article III's requirements. *See Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979) (explaining that "*Congress may, by legislation,* expand standing" to encompass litigants otherwise "barred by prudential standing rules" but that "[i]n no event . . . may Congress abrogate the Art[icle] III minima" (emphasis added) (internal quotation marks and citations omitted)).

Third, even if the majority properly characterized its analysis as involving prudential considerations, an analysis of those factors would come only after addressing the constitutional minimum requirements. *See McKinney v.*

details regarding the constitutional standing require-
ments under Article III and then analyze one of the
elements in particular—i.e., injury in fact.

### A. Starr Does Not Satisfy the Constitutional Require-
ments for Standing

#### 1. Constitutional Standing Requirements

The Constitution delegates certain powers across the
three branches of the Federal Government and places
limits on those powers. *See INS v. Chadha*, 462 U.S. 919,
951 (1983) (The Constitution "divide[s] the delegated
powers of the . . . [F]ederal [G]overnment into three
defined categories, legislative, executive[,] and judicial, to

---

*U.S. Dep't of Treasury*, 799 F.2d 1544, 1549 (Fed. Cir.
1986) ("[T]he court must undertake a two-step analysis
which involves both the constitutional limitations and the
prudential limitations that circumscribe standing. As a
*threshold matter*[,] the court *must* ensure that the litigant
satisfies the requirements of Article III of the Constitu-
tion. *Once the court determines that the litigant satisfies
the constitutional aspects*, it must consider . . . prudential
limitations . . . ." (emphases added) (citations omitted)).
Indeed, the majority of the cases in the majority's brief
discussion of standing under federal law, Maj. Op. 18–22
& nn.16–18, first address "the constitutional require-
ments of Article III" before "nonconstitutional prudential
considerations," *Franchise Tax Bd. v. Alcan Aluminum
Ltd.* 493 U.S. 331, 335, 335–38 (1990); *see, e.g.*, *Lexmark*,
134 S. Ct. at 1386 ("satisf[ying]" itself of "standing under
Article III" before turning to prudential considerations);
*Singleton v. Wulff*, 428 U.S. 106, 112–18 (1976) (explain-
ing that the first inquiry is Article III's constitutional
standing requirements and the second inquiry is pruden-
tial considerations and then addressing these considera-
tions in turn).

assure . . . that each Branch of government . . . confine[s] itself to its assigned responsibility."). "Article III of the Constitution" discusses the powers granted to the Judicial Branch and, inter alia, "confines the judicial power of federal courts to deciding actual 'Cases' or 'Controversies.'" *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (quoting U.S. Const. art. III, § 2).

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" required by Article III. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The Supreme Court has established three elements comprising the "irreducible minimum" necessary to establish standing under the Constitution. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). The party invoking federal jurisdiction must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547 (citations omitted).

### 2. Starr Has Not Shown That It Suffered an Injury in Fact

Although the party invoking federal jurisdiction must satisfy these constitutional minimum requirements at each stage of the litigation, the parties failed to address these elements in their briefs. This does not, however, prevent us from considering the issue. *See Bender*, 475 U.S. at 546 (holding that courts can raise standing sua sponte). Therefore, we first consider the constitutional elements of standing.

The "[f]irst and foremost" element of the constitutional standing inquiry is whether Starr has shown injury in fact. *Citizens for Better Env't*, 523 U.S. at 103 (citation omitted). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and

actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks and citation omitted). Because the Court of Federal Claims tried the case, Starr must show standing through "facts (if controverted) . . . supported adequately by the evidence adduced at trial." *Lujan*, 504 U.S. at 561 (internal quotation marks and citation omitted).

Starr cannot show injury in fact because Starr's injury was not particularized. "Particularization is necessary to establish injury in fact." *Spokeo*, 136 S. Ct. at 1548. "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* (internal quotation marks and citation omitted). Neither the Court of Federal Claims nor Starr has presented any evidence that Starr's injury was particularized. In fact, Starr acknowledged that "[e]ach of the actions taken by the Government had an effect that was shared across *all* of the common stock *on a ratable basis, share for share*" in support of class certification. J.A. 501694 (emphases added) (internal quotation marks and citation omitted); Oral Argument 8:15–8:37, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2015-5103.mp3 ("Starr was not affected any differently than other shareholders with respect to the fact that it lost 80% of its voting control . . . . [I]t was not proportionally affected differently.").

In an effort to show injury in fact, Starr attempts to analogize its position to the shareholders in *Alleghany Corp. v. Breswick & Co.*, 353 U.S. 151 (1957). Starr Resp. & Reply 33–34. However, these arguments are unpersuasive. In *Alleghany*, the Supreme Court held the shareholders had direct standing to sue because the "new preferred stock issue . . . is convertible, and under the relevant notions of standing, the . . . dilution of the equity of the common stockholders provided sufficient financial interest to give them standing." 353 U.S. at 160 (internal quotation marks omitted). But *Alleghany* was "not a case . . . where the injury feared [was] the indirect harm

which may [have] result[ed] to *every* stockholder from harm to the corporation." *Id.* at 159–60 (internal quotation marks and citation omitted). Instead, the "minority common stockholders" in *Alleghany* suffered injury that was distinct from the other stockholders. *Id.* at 158–60. Starr's alleged injury, in contrast, "is the indirect harm which may result to every stockholder from harm to the corporation," which "is clearly insufficient to give . . . standing independently to institute suit." *Pittsburgh & W. Va. Ry. Co. v. United States*, 281 U.S. 479, 487 (1930). Thus, Starr has failed to show particularization of its purported injury in fact.

Because Starr has not met its burden of showing that its injury was particularized through facts supported by the evidence adduced at trial, it cannot show injury in fact.[9] As a result Starr cannot demonstrate the "irreduci-

---

[9] The majority mischaracterizes the "sole basis" of my conclusion as the "number of people affected." Maj. Op. 18–19 n.16. This is inaccurate. My conclusion is based on Starr's failure to meet its burden of showing that its alleged injury was distinct from the remaining AIG shareholders' injury and was not an injury stemming from an indirect injury to the corporation, as instructed by *Pittsburgh*. *See* 281 U.S. at 487. Moreover, had Starr demonstrated that any alleged harm was particularized, several hurdles remained to establishing injury in fact. For example, the Court of Federal Claims determined that, absent Government intervention, Starr's shares would have been valueless. *See Starr IX*, 121 Fed. Cl. at 474 (stating that "[t]he inescapable conclusion is that AIG would have filed for bankruptcy, most likely during the week of September 15–19, 2008," and that "the value of the shareholders['] common stock would have been zero"). That finding suggests a lack of an injury in fact. Beyond the injury in fact requirement, Starr also would be re-

ble minimum" elements of constitutional standing. Therefore, I need not address the second and third elements of standing, i.e., traceability and redressability, nor do I, for the purposes of a constitutional standing analysis, need to consider the parties' arguments as to standing under Delaware law.[10]   For these reasons, I would hold that Starr does not have constitutional standing to invoke federal court jurisdiction.

CONCLUSION

The Court of Federal Claims continuously deferred consideration of threshold issues of jurisdiction and constitutional standing.   The majority does the same, avoiding difficult issues of jurisdiction and standing established by the Constitution and by statute in favor of state law.   Rather than perpetuate these errors, I prefer to evaluate the instant appeal using the requirements imposed by the Constitution, Congress, and the Supreme Court.   Under this framework, I would find that the Court of Federal Claims did not have jurisdiction to adjudicate Starr's illegal exaction claim and that Starr does not have standing to allege a Fifth Amendment taking without just compensation.   Therefore, although my reasoning differs, I concur-in-part on standing and concur-in-the-result that vacatur and remand is warranted.   When the action returns to the Court of Federal Claims, it should be dismissed.

---

quired to demonstrate satisfaction of the remaining Article III requirements.

[10]   While I agree with the majority's analysis under the "dual-nature exception" in Delaware corporate law (to the extent it is applicable), I would not reach that issue because Starr lacks constitutional standing.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## INFORMATION SHEET

## FILING A PETITION FOR A WRIT OF CERTIORARI

There is no automatic right of appeal to the Supreme Court of the United States from judgments of the Federal Circuit. You must file a petition for a writ of certiorari which the Supreme Court will grant only when there are compelling reasons. (See Rule 10 of the Rules of the Supreme Court of the United States, hereinafter called Rules.)

**Time.** The petition must be filed in the Supreme Court of the United States within 90 days of the entry of judgment in this Court or within 90 days of the denial of a timely petition for rehearing. The judgment is entered on the day the Federal Circuit issues a final decision in your case. [The time does not run from the issuance of the mandate, which has no effect on the right to petition.] (See Rule 13 of the Rules.)

**Fees.** Either the $300 docketing fee or a motion for leave to proceed in forma pauperis with an affidavit in support thereof must accompany the petition. (See Rules 38 and 39.)

**Authorized Filer.** The petition must be filed by a member of the bar of the Supreme Court of the United States or by the petitioner representing himself or herself.

**Format of a Petition.** The Rules are very specific about the order of the required information and should be consulted before you start drafting your petition. (See Rule 14.) Rules 33 and 34 should be consulted regarding type size and font, paper size, paper weight, margins, page limits, cover, etc.

**Number of Copies.** Forty copies of a petition must be filed unless the petitioner is proceeding in forma pauperis, in which case an original and ten copies of the petition for writ of certiorari and of the motion for leave to proceed in forma pauperis. (See Rule 12.)

**Where to File.** You must file your documents at the Supreme Court.

**Clerk**
**Supreme Court of the United States**
**1 First Street, NE**
**Washington, DC 20543**
**(202) 479-3000**

No documents are filed at the Federal Circuit and the Federal Circuit provides no information to the Supreme Court unless the Supreme Court asks for the information.

**Access to the Rules.** The current rules can be found in Title 28 of the United States Code Annotated and other legal publications available in many public libraries.

Revised December 16, 1999

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## *Questions and Answers*

### Petitions for Rehearing (Fed. Cir. R. 40)
### and
### Petitions for Hearing or Rehearing En Banc (Fed. Cir. R. 35)

---

*Q. When is a petition for rehearing appropriate?*

A. Petitions for panel rehearing are rarely successful because they most often fail to articulate sufficient grounds upon which to grant them. For example, a petition for panel rehearing should not be used to reargue issues already briefed and orally argued; if a party failed to persuade the court on an issue in the first instance, a petition for panel rehearing should not be used as an attempt to get a second "bite at the apple." This is especially so when the court has entered a judgment of affirmance without opinion under Fed. Cir. R. 36.  Such dispositions are entered if the court determines the judgment of the trial court is based on findings that are not clearly erroneous, the evidence supporting the jury verdict is sufficient, the record supports the trial court's ruling, the decision of the administrative agency warrants affirmance under the appropriate standard of review, or the judgment or decision is without an error of law.

*Q. When is a petition for hearing or rehearing en banc appropriate?*

A. En banc decisions are extraordinary occurrences. To properly answer the question, one must first understand the responsibility of a three-judge merits panel of the court. The panel is charged with deciding individual appeals according to the law of the circuit as established in the court's precedential opinions. While each merits panel is empowered to enter precedential opinions, the ultimate duty of the court en banc is to set forth the law of the Federal Circuit, which merit panels are obliged to follow.

Thus, as a usual prerequisite, a merits panel of the court must have entered a precedential opinion in support of its judgment for a suggestion for rehearing en banc to be appropriate. In addition, the party seeking rehearing en banc must show that either the merits panel has failed to follow identifiable decisions of the U.S. Supreme Court or Federal Circuit precedential opinions or that the merits panel has followed circuit precedent, which the party seeks to have overruled by the court en banc.

*Q. How frequently are petitions for rehearing granted by merits panels or petitions for rehearing en banc accepted by the court?*

A. The data regarding petitions for rehearing since 1982 shows that merits panels granted some relief in only three percent of the more than 1900 petitions filed. The relief granted usually involved only minor corrections of factual misstatements, rarely resulting in a change of outcome in the decision.

En banc petitions were accepted less frequently, in only 16 of more than 1100 requests. Historically, the court itself initiated en banc review in more than half (21 of 37) of the very few appeals decided en banc since 1982. This sua sponte, en banc review is a by-product of the court's practice of circulating every precedential panel decision to all the judges of the Federal Circuit before it is published. No count is kept of sua sponte, en banc polls that fail to carry enough judges, but one of the reasons that virtually all of the more than 1100 petitions made by the parties since 1982 have been declined is that the court itself has already implicitly approved the precedential opinions before they are filed by the merits panel.

*Q. Is it necessary to have filed either of these petitions before filing a petition for certiorari in the U.S. Supreme Court?*

A. No. All that is needed is a final judgment of the Court of Appeals. As a matter of interest, very few petitions for certiorari from Federal Circuit decisions are granted. Since 1982, the U.S. Supreme Court has granted certiorari in only 31 appeals heard in the Federal Circuit.  Almost 1000 petitions for certiorari have been filed in that period.

October 20, 2016